Keith Daniel WILLIAMS, Petitioner,

v.

Daniel VASQUEZ, Warden; and the Attorney General for the State of California, Respondents.

No. CV–F–89–160–REC–P.

United States District Court, E.D. California.

Feb. 9, 1993.

As Amended April 1, 1993.

pursuant to 28 U.S.C. § 2254. Petitioner challenges his state court conviction on three counts of first degree murder with special circumstances, and his death sentence.[1] Petitioner sets forth nineteen claims of alleged federal constitutional error which he contends require a reversal of his guilt, sanity, and/or penalty phase verdicts.

Petitioner requested an evidentiary hearing on Claims A, B, C, E, F, G, H, and I. The court granted and conducted an evidentiary hearing on Claim A.[2]

After careful review of each claim presented in the amended petition and all supporting documentation, including the entire state court record, all papers filed by the parties, and the evidence presented at the evidentiary hearing, the court finds that no claim submitted by Petitioner warrants federal habeas relief. Accordingly, the amended petition for a writ of habeas corpus is denied as set forth herein.

J. Robert Jibson, California State Atty. Gen., Asst. Deputy Atty. Gen., Sacramento, CA, for respondents.

David A. Nickerson, Mazer and Nickerson, San Francisco, CA, for petitioner.

DEATH PENALTY CASE

ORDER DENYING AMENDED PETITION FOR A WRIT OF HABEAS CORPUS

COYLE, Chief Judge.

## I. Introduction

Petitioner, Keith Daniel Williams, filed an amended petition for a writ of habeas corpus

## II. Facts [3]

This case involves the shooting deaths of Lourdes Meza (Meza), Miguel Vargas (M. Vargas), and Salvador Vargas (S. Vargas) by Petitioner. The events leading up to the killings began on Friday, October 6, 1978, when Petitioner met Meza and M. Vargas at a yard sale at the Galt home of Robert Tyson (Tyson) and Karen Tyson (K. Tyson).

At the yard sale, Petitioner, having noticed and admired M. Vargas' car, expressed a desire to purchase it. Petitioner subsequently obtained M. Vargas' permission to test drive the car. After the test drive, Petitioner reiterated his interest in buying the car.

---

1. The state tried and convicted Petitioner pursuant to the 1977 version of California's death penalty statute, Cal.Penal Code §§ 190–190.6. Unless otherwise noted, references are to the 1977 statute.

2. In a letter to the court dated October 19, 1992, Petitioner argues that, pursuant to *Hendricks v. Vasquez*, 974 F.2d 1099 (9th Cir.1992), he is entitled to an evidentiary hearing on all claims alleging ineffective assistance of counsel. The court disagrees; the Ninth Circuit clearly did not go that far in *Hendricks*. Moreover, even if Petitioner's interpretation of *Hendricks* is correct, and assuming, *arguendo*, that the challenged con-

duct constituted error, Petitioner is not entitled to an evidentiary hearing on his ineffective assistance of counsel claims because he has failed to demonstrate prejudice.

3. A complete factual background is set forth in *People v. Williams*, 44 Cal.3d 883, 245 Cal.Rptr. 336, 751 P.2d 395 (1988), *cert. denied*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 237 (1988), and *infra* notes 16 & 17. The evidence is undisputed except as to the extent of Petitioner's drug and alcohol consumption and its possible effect on his mental state.

The sale, however, was not consummated that day.

While subsequently informing the Tysons of his intent to purchase the vehicle, Petitioner commented that he had discovered the automobile registration in the glove box during his test drive. He surmised that it would be easy to obtain possession of the car and registration by loading Meza and M. Vargas in the trunk and dumping them in a field.

On Saturday, October 7, 1978, M. Vargas returned to the Tysons' home to consummate the sale of the car. Petitioner passed a stolen check in the amount of $1,500 to M. Vargas and took possession of the car. The parties agreed that M. Vargas would retain the registration until Petitioner's check cleared the following Monday.

Later on October 7th, M. Vargas returned to the Tysons' home displaying a "wad" of bills and offering to purchase a gun from Petitioner. Petitioner declined to sell the gun at that time. However, the parties discussed the possibility of a subsequent meeting at M. Vargas' home regarding the sale of the gun.

The next day, Sunday, October 8, 1978, Petitioner and Tyson, armed with handguns, drove from Galt to the Merced farmhouse in which M. Vargas lived with Meza and his cousin S. Vargas. Petitioner's intent in travelling to Merced was to commit robbery; he had also discussed killing M. Vargas and Meza.

Upon arriving at the farmhouse, Petitioner and Tyson discovered that guests were visiting their intended victims. Consequently, Petitioner and Tyson temporarily postponed their felonious plans, left their guns in the car, and joined the others in the house. They found M. Vargas and Meza downstairs entertaining three visitors. S. Vargas had already retired upstairs to rest.

After the guests departed, M. Vargas re-expressed his interest in buying Petitioner's gun. Petitioner and Tyson then exited the house and retrieved their guns from the car. Upon re-entering the house Petitioner held his gun on M. Vargas. M. Vargas thought Petitioner was joking, and Tyson reinforced this misperception by pulling away Petitioner's arm. Tyson later justified this interruption of Petitioner's actions, informing Petitioner that his own gun was not loaded and reminding him that S. Vargas was sleeping upstairs.

Shortly after this incident, Petitioner invited M. Vargas to join Tyson and him for a drink. When M. Vargas declined, Tyson suggested that Petitioner and he buy some beer and bring it back to the farmhouse. Petitioner and Tyson then left the farmhouse on the pretext of buying beer; they used this time to discuss strategy.

When Petitioner and Tyson subsequently re-entered the farmhouse they found M. Vargas downstairs and S. Vargas and Meza upstairs. Petitioner put the plan in action, running to the second floor and ordering Tyson to bring M. Vargas upstairs and take Meza downstairs and shoot her.

After Tyson and Meza went downstairs, Petitioner shot both men in the back of the head, killing them. Tyson, however, did not shoot Meza. Instead, he and Petitioner took her from the farmhouse and drove toward Sonora. En route, Petitioner had intercourse with Meza.

Upon reaching an unpopulated area, Petitioner and Meza exited the car. They walked to a field a short distance away where Petitioner shot Meza four times and left. Petitioner and Tyson then returned to Galt; Tyson remained in Galt, while Petitioner headed for Southern California.

The next day, Monday, October 9, 1978, a relative of the slain men discovered their bodies lying in a pool of blood. Authorities did not locate Petitioner's third victim until Friday, October 13, 1978, when Tyson surrendered and led them to Meza's naked body in a secluded area near Sonora.

The state charged Petitioner with three counts of first degree murder [4] with firearm enhancements and ten special circumstances,

---

**4.** The state charged Tyson with three counts of murder. At his trial, which occurred prior to Petitioner's, the jury found Tyson guilty on all counts, and the court sentenced him to three life terms in prison with the possibility of parole.

including multiple murder, robbery, kidnapping, and rape.

After a three and one-half week trial, the jury found Petitioner guilty of murdering M. Vargas, S. Vargas, and Meza in the first degree.[5] The jury also determined that Petitioner was sane during the commission of the offenses, and recommended the death sentence.

The California Supreme Court affirmed Petitioner's conviction and sentence and denied his first habeas corpus petition on March 24, 1988. *Williams,* 44 Cal.3d 883, 245 Cal.Rptr. 336, 751 P.2d 395. The court summarily denied his second habeas petition on February 17, 1989. Petitioner's conviction became final on October 11, 1988, upon the Supreme Court's denial of his petition for a writ of certiorari.

## III. Discussion

### A. Claim A

Petitioner alleges that prosecutorial misconduct during the guilt phase of his trial resulted in the violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.[6] Specifically, Petitioner claims that the prosecutor, Larry Howard (L. Howard),[7] violated his right to due process by failing to correct Tyson's testimony, which he knew to be perjurious, and that the guilt and penalty phase verdicts must, therefore, be reversed.

5. The jury found that Petitioner premeditated the murders and willfully and ·deliberately committed them with·express malice aforethought, committed the murders during a robbery, and used a firearm in the commission of each offense. The jury also found the robbery, multiple murder, and kidnapping special circumstances to be true.

6. Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts provides that a petition "shall specify all the grounds for relief which are available to the petitioner ... and shall set forth in summary form the facts supporting each of the grounds thus specified." Although Petitioner asserts violations of the Fifth, Sixth, Eighth and Fourteenth Amendments, he presents substantive argument regarding only a Fourteenth Amendment due process claim. The court restricts its review of Claim A accordingly. Similarly, the court restricts its review of Petitioner's subsequent claims to those substantively argued.

At Petitioner's trial, Tyson testified as follows:

Q [L. Howard]: [D]id I or anyone from the district attorney's office make any promises with respect to any charges that would be filed against you?

A: No. I was told that whatever was filed against me would be up to the grand jury.

**Q: Have any promises been made to you as far as you're concerned for your testimony here today?**

A: None.

RT Vol. V 1004:18–25 (emphasis added). Tyson further testified on cross-examination:

Q [Roland Howard]: At the time you appeared in Superior Court to be sentenced for the three murders that you were convicted of, didn't you have discussions with the district attorney's office regarding what disposition of your case in terms of sentence would be made in terms of their recommendation of sentence at the time?

A: No.

Q: In exchange for your cooperation.

A: No.

RT Vol. V 1009:16–24.

■ The court conducted an· evidentiary hearing on Claim A, limited to the issue of Tyson's alleged perjury at Petitioner's trial and the prosecutor's knowing use thereof.[8]

7. The prosecutor, Larry Howard, is not to be confused with Petitioner's trial attorney, Roland Howard.

8.· If established, "[p]rosecutorial misconduct in a state criminal proceeding will be grounds for a writ of habeas corpus unless the prosecution can show that the error was harmless beyond a reasonable doubt." *Brown v. Borg,* 951 F.2d 1011, 1014 (9th Cir.1991) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). Accordingly, notwithstanding the limitation in the order granting the evidentiary hearing, the court realizes that, in considering this claim, the question is not whether the legally admitted evidence was sufficient to support the verdicts, but rather whether the state has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Satterwhite v. Texas,* 486 U.S. 249, 258–259, 108 S.Ct. 1792, 1798–1799, 100 L.Ed.2d 284 (1988) (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828).

A claim of prosecutorial misconduct must be demonstrated by a preponderance of the evidence. *United States v. Lord,* 711 F.2d 887, 891 & n. 3 (9th Cir.1983). Petitioner has not satisfied this standard.

### 1. The Asserted Parole Deal

Petitioner contends that the first alleged deal consisted of the prosecution's promise that it would not oppose Tyson's parole if he testified at Petitioner's trial. This deal was allegedly consummated at the Merced County Court Building on March 22, 1979, just prior to Tyson's testimony in Petitioner's case. Although Tyson apparently first alleged the existence of this deal at his October 2, 1986, parole consideration hearing, Petitioner learned of this deal on October 28, 1988, when his present counsel, David Nickerson, and his investigator, Russell Stetler, interviewed Tyson in prison. During that interview, Tyson "was asked if he had made any deals or agreements with the prosecution in exchange for his testimony at WILLIAMS' trial. Tyson said he had." 2PHC Exh. D Stetler Decl. ¶ 5. The investigator relayed Tyson's account of that deal as follows: [9]

> [a]fter his own conviction of an indeterminate sentence, Tyson was contacted by Merced detectives, including Ron Hauser, and the prosecuting attorney, Larry Howard. Mr. Howard told Tyson, "We can make sure you rot in prison." District Attorney Howard then explained that if Tyson agreed to testify against WILLIAMS, the Merced County District Attorney's Office would not oppose Tyson's release when he became eligible for parole.

Tyson was assured that if he testified against WILLIAMS the District Attorney would "make sure the [Parole] Board knew" about his cooperation. Tyson agreed to testify against Williams.

*Id.*

Petitioner argues that Tyson's testimony, as set forth in the October 2, 1986, Request for Investigation, and as given at the October 27, 1987, parole consideration hearing and the evidentiary hearing, demonstrate the existence of this deal. Petitioner further argues that L. Howard's deposition testimony supports a finding that this deal existed. The court is not persuaded.

First, Tyson conceded at the evidentiary hearing that the prosecutor made no promises in exchange for his testimony at Petitioner's trial:

> A: His [L. Howard's] words to my best recollection was that if you do—"If you don't [testify], we can keep you in for a long time, but if you do, we can endorse you to get a parole date." He says, "I can't promise you nothing right now."
>
> . . . .
>
> Q [Robert Jibson]: Isn't it true, Mr. Tyson, that in fact the district attorney, Mr. Howard, during this brief meeting that you've referred to specifically told you that he could not make you and was not making you any promises at that time?
>
> A: He said he couldn't right then.
>
> Q: He said he was not making a promise; is that correct?
>
> A: He said he couldn't, yes.

---

9. A universally agreed upon version of this alleged deal does not exist. Petitioner has characterized this deal as the prosecution's promise not to oppose Tyson's parole if Tyson testified at Petitioner's trial. *See, e.g.,* EH 21:9–12; 23:14–19; 31:5–12. However, Tyson has characterized this deal as follows: (1) " 'Remember you've got to go up for parole. We can argue the point or we can go along with the parole date.' ... that was the promise I was given." PEH Exh. 1 79:14–16; 79:24–25 (quoting L. Howard, the detectives, and Officer Leutwyller); (2) "it would help me obtain a [parole] date if I was to testify." REH Exh. F 1; (3) " 'if you don't [testify], we can keep you in for a long time, but if you do, we can endorse you to get a parole date.' " EH 8:23–25 (quoting L. Howard); (4) "My belief was that

when I went up for parole, they would submit a recommendation for parole." EH 9:9–11. Tyson has also been credited with the following renditions of this alleged deal: (1) "A review of the transcript of Tyson's Subsequent Parole Consideration Hearing held October 2, 1986, indicates that Tyson expected a representative from the Merced County District Attorney's Office to either personally appear or to send a letter in his support." PEH Exh. 2 2; and (2) "if Tyson agreed to testify against WILLIAMS, the Merced County District Attorney's Office would not oppose Tyson's release when he became eligible for parole. Tyson was assured that if he testified against WILLIAMS the District Attorney would 'make sure the [Parole] Board knew' about his cooperation." 2PHC Exh. D Stetler Decl. ¶ 5.

Q: The answer is yes?

A: (Witness nods head.)

EH 8:22–9:1; 12:21–13:7.

Second, the Board of Prison Terms (Board), conducted an investigation designed to determine "what type of 'deal' was arranged for Mr. Tyson's cooperation in the Keith Daniel Williams case," PEH Exh. 2 1, and concluded that the alleged parole deal did not exist. *Id.* at 3.

Finally, the prosecutor has consistently denied making a promise to Tyson in exchange for his testimony. Ans.Exh. I L. Howard Decl. ¶2; PEH Exh. 3 6:17–7:19; 20:8–14. Instead, the prosecutor describes the following interaction with Tyson regarding the alleged parole deal:

> I did not threaten Mr. Tyson that the District Attorney's Office or law enforcement agencies could make sure he would "rot in prison" in order to obtain Mr. Tyson's testimony at Mr. Williams' trial, nor did I promise Mr. Tyson that if he testified against Mr. Williams the District Attorney's Office would not oppose Mr. Tyson's early release on parole when Mr. Tyson became eligible for parole.
>
> I did advise Mr. Tyson that his testimony at Mr. Williams' trial would be a matter of public record, and as such he could bring the record of his testimony for the People to the attention of the Parole Board for their consideration and also to the attention of correctional authorities for their consideration for protective custody because of that testimony.

Ans. Exh. I L. Howard Decl. ¶¶ 3–4.

Thus, Petitioner has failed to set forth sufficient evidence demonstrating the existence of a parole deal. Neither party to the alleged deal, nor the Board has acknowledged the existence of this deal. Accordingly, the court finds that Tyson's testimony was not perjurious, and denies relief as to this aspect of Claim A.

**2. The Asserted Death Penalty Deal**

Just prior to the evidentiary hearing, Petitioner asserted the existence of an additional deal. Tyson and L. Howard allegedly entered into this deal on October 13, 1978, the day Tyson surrendered and assisted the authorities in their search for Meza's body. Petitioner alleges that during the search, L. Howard promised Tyson that the District Attorney's Office would not seek the death penalty against him if Tyson agreed to testify at Petitioner's trial.

Petitioner discovered the existence of this alleged deal when his counsel deposed L. Howard in preparation for the evidentiary hearing.[10] Petitioner asserts that the Board's Report of Investigation, the testimony of Deputy District Attorney Gordon Spencer (Spencer) at Tyson's October 27, 1987, parole consideration hearing, and the deposition testimony of L. Howard all support the existence of this deal. The court disagrees.

Tyson has never claimed that this deal existed. In fact, Tyson specifically rejected the existence of this deal at his October 27, 1987, parole consideration hearing when he testified, "[u]h, there was no promise before I went to trial I, I made none because he [Petitioner] was not even in custody when the grand jury indicted me." PEH Exh. 1 79:18–21.

The prosecutor also denied making this promise to Tyson in exchange for his testimony:

> Q [David Nickerson]: There wasn't a deal made prior to Tyson's trial that, for instance, for his testimony against Williams he would get—he would plead to X offense and get X years?
>
> A: No.
>
> Q: There was no such deal like that.
>
> A: No.
>
> Q: Was one offered, do you remember?
>
> A: No.
>
> Q: None was offered.
>
> A: That's right.

---

**10.** L. Howard was medically unavailable to testify at the evidentiary hearing, but both parties deposed him prior thereto.

PEH Exh. 3 19:3–13. According to L. Howard, the following conversation transpired on the occasion in question:

Q [Robert Jibson]: ... what was said if anything, for example, by you, first of all, to Mr. Tyson with regard to the death penalty?

A: The only thing that I recall telling Tyson was that I told him that he was—asked him, really, if he was willing to testify. And he was very blunt. He said, "Sure. I'll do anything." And I said, "Is what you have told the investigators the truth?" And he said, "Yes." And I said, "Do you understand that we have to do some investigating and check out what you're saying to us? But if what you're saying is corroborated by what we find out, then we'll not seek the death penalty."

. . . .

Q: ... under the 1977 death penalty law intent to kill, in fact, premeditation and deliberation were legally required to prove special circumstances, correct?

A: That's true.

. . . .

Q: ... you couldn't have sought the death penalty against him and you were telling him as such if the story he told you was true; is that right?

A: Yes.

*Id.* at 9:10–10:8; 11:6–9; 11:14–18.

Thus, this alleged deal did not exist. The prosecutor did not make a promise to Tyson, he merely explained the law with regard to Tyson's actions on the assumption that Tyson's rendition of the events would be corroborated by the ensuing investigation.[11]

Accordingly, because Tyson's statement that the prosecution made no promises to him in exchange for his testimony was not perjurious, relief as to Claim A is denied.

## B. Claim B

Petitioner alleges that his trial counsel violated his Sixth, Eighth, and Fourteenth Amendment rights by failing to adequately investigate facts in support of his diminished capacity and insanity defenses, and in mitigation of penalty. Petitioner further alleges that counsel erred by failing to move to suppress or object to Petitioner's alleged pre-*Miranda* remarks to arresting officers in Arizona, to the testimony of Tyson and K. Tyson, to the court's *M'Naghten* insanity instruction, to the introduction of evidence regarding Petitioner's prior criminal record, to the appointment of psychiatrists for the dual purpose of determining Petitioner's sanity and his competency to stand trial, by reading the psychiatrists' reports directly into the record during the sanity phase, and by failing to request an instruction limiting the scope of the jury's consideration of said psychiatric reports.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court articulated the test used to determine whether a petitioner received ineffective assistance of counsel:

[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it

---

11. The court's conclusion is not altered by Petitioner's argument that Spencer supposedly affirmed the existence of this alleged deal at Tyson's 1987 parole consideration hearing. Spencer's mere statement that the "agreement between him [L. Howard] and Mr. Tyson is as stated in the investigation report", PEH Exh. 1 73:21–23, does not demonstrate the existence of an exchange of promises between L. Howard and Tyson. Instead, it merely generalizes information provided by L. Howard.

Similarly, the Board's conclusion that the District Attorney's Office would not seek the death penalty against Tyson if he testified against Williams, PEH Exh. 2 3, is not determinative. The Board's conclusion, based on a third party's synopsis of L. Howard's statements, is inferior to L. Howard's direct testimony under oath.

cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

A court may dispose of an ineffectiveness claim if either prong of the test is not met. *Id.* at 697, 104 S.Ct. at 2069.

### 1. Failure to Investigate

#### a. Guilt Phase—Diminished Capacity Defense

Petitioner alleges ineffective assistance of counsel at the guilt phase because his trial counsel had no knowledge of Cal.Penal Code § 987.9,[12] and because he failed to adequately investigate facts in support of a diminished capacity defense. Petitioner contends it is reasonably probable that, but for these alleged errors, the jury would have returned a verdict of not true on the special circumstances, of a lesser degree of homicide, or of not guilty. The court wholeheartedly disagrees.

A reviewing court must consider the totality of the evidence when making a determination of prejudice. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. The effect of the alleged errors on the factual findings may vary. As the Supreme Court has determined:

[s]ome of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have a pervasive effect ... and some will have an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.*

Despite Petitioner's assertion that he suffered prejudice due to counsel's alleged failure to investigate his diminished capacity defense,[13] the record overwhelmingly establishes the contrary. For example, although Petitioner testified that he had ingested a significant amount of drugs and alcohol on the day of the murders,[14] and that his memo-

12. This section, which became effective September 24, 1977, provided as follows:

[i]n the trial of a capital case the indigent defendant, through his counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. The application for such funds shall be by affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense. The fact that such an application has been made shall be confidential and the contents of the application shall be confidential. Upon receipt of such application, a judge of the court, other than the trial judge presiding over the capital case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing. In making such a ruling, the court shall be guided by the need to provide a complete and full defense for the defendant.

13. Specifically, Petitioner contends that he suffered prejudice due to counsel's failure to obtain his psychiatric records from Clairemont Hospital and Terminal Island. Petitioner alleges these records would have established that he: (1) suffered epileptic seizures; (2) used heroin for thirteen years; (3) underwent personality changes with drug and alcohol use; (4) suffered head injuries, hearing loss, and frequent and severe

headaches; (5) experienced blackouts; (6) had symptoms of depression and/or other mental difficulty, including irritability, crying spells, sleep disturbance, paranoia, seeing "flashes of light," and hearing "his name being called;" (7) exhibited violent behavior; and (8) had been rejected from military service on mental grounds.

Petitioner further contends that adequate investigation would have produced California Youth Authority records demonstrating that he received electroshock therapy at the age of 16 or 17, and underwent a competency evaluation ordered by a federal district court in Utah in 1974.

14. Petitioner alleges the following consumption of drugs and alcohol on the day of the murders: whiskey and beer, RT Vol. VI 1191:23–1193:5, one "bag" (quarter teaspoon) heroin and/or morphine, *id.* at 1205:17–1207:1, eight beers, *id.* at 1207:18–26, marijuana, *id.* at 1208:1–2, and valium. *Id.* at 1209:4–9.

In contrast, Tyson and K. Tyson testified that, to their knowledge, Petitioner consumed no drugs that day, RT Vol. IV 840:5–13; RT Vol. V 953:19–20; 1084:3–1085:10; but that he consumed an amount of beer in the morning, and some, but not an exceeding amount of, alcohol in the afternoon and evening. RT Vol. IV 839:14–19; 839:23–840:1; RT Vol. V 953:2–8; 957:14–17; 957:22–23; 958:18–27; 965:15–27; 1070:18–24; 1079:25–1081:28. Furthermore, Tyson and K. Tyson, Nadine Padilla and Sylvia

ry of the killings was intermittent, RT Vol. VI 1323:17–19, these self-serving statements fundamentally differ from the wealth of de-

Wharton all testified that Petitioner was sober on the evening of the murders. RT Vol. III 545:20–23; 550:16–18; 561:16–20; RT Vol. IV 840:17–19; RT Vol. V 965:10–14; 997:9–13. That Petitioner was not intoxicated is further substantiated by the fact that, as described *infra* notes 16 & 17, Petitioner's testimony closely tracks that of Tyson and K. Tyson.

15. In the confession admitted into evidence, Petitioner clearly described the sequence of events surrounding the murders, including meeting two of the victims at the garage sale, planning to kill the victims, murdering M. Vargas and S. Vargas, having sex with Meza, preventing Meza's attempted escape, killing Meza, and berating Tyson for crying.

16. With few exceptions, Petitioner's testimony closely parallels that of Tyson and K. Tyson. *See infra* note 17. His detailed, consistent recollection demonstrates his presence of mind, as does the fact that he was physically and mentally able to accomplish so many actions requiring skill, dexterity, and forethought.

Petitioner testified that he had "made some type of statement about '[i]t'd be easy just to get rid of them'" two days before the murders. RT Vol. VI 1252:24–26. He further testified that, one day before the murders, he planned to rob or "burglarize" the victims, *id.* at 1264:6–17, and that killing the three victims "had [been] spoken of." *Id.* at 1290:5–9.

To prepare for his felonious escapade Petitioner spent one and one-half to two hours carefully dismantling the guns "down to the trigger mechanisms," *id.* at 1266:3, and then "cleaned them, put them back together." *Id.* at 1265:8–1266:6; 1266:27–1267:24. He sent his ex-wife to buy ammunition for the guns, *id.* at 1266:12–15, and to prostitute herself or "hustle" gas money for the trip to Merced. *Id.* at 1263:11–1264:5. He also traded a camera for $5.00 worth of gas. *Id.* at 1205:10–12.

On the day of the murders, before leaving for Merced, Petitioner thought to retrieve a towel from K. Tyson to conceal his weapon while en route. *Id.* at 1272:22–1273:3.

Petitioner drove the entire trip from Galt to Merced at speeds of 80 to 100 miles per hour. *Id.* at 1275:1–15. During that time he and Tyson discussed the anticipated incident. *Id.* at 1274:16.

Petitioner was able to describe, in good detail, the sequence of events upon arriving in the Merced area. For example, he testified as to the specific route he took from the Franklin Tavern to the farmhouse, *id.* at 1275:22–1276:20, and described stopping three times to ask for directions. *Id.* at 1273:17–26; 1275:27–1276:4; 1276:18–27.

tails Petitioner provided in his taped confession six weeks after the murders,[15] his trial testimony more than five months after the murders,[16] the details set forth in the testi-

Upon arrival at the farmhouse, Petitioner had the presence of mind to investigate the situation before launching his plan, *i.e.*, he and Tyson entered the premises to determine the number of people therein, leaving their guns and gloves in the car. *Id.* at 1277:12–24. Once inside the farmhouse, Petitioner coherently conversed with those present, and remarked on the "nice home," the car's gas mileage, and the validity of the check he had passed in payment for the car. *Id.* at 1280:18–1281:5.

Petitioner clearly recalled events that occurred after all the visitors had departed. He stated that Tyson interrupted his first "throw down" on M. Vargas, *id.* at 1283:13–19; 1284:11–18; 1285:14–24, and that he and Tyson, on the pretext of buying beer, left for a short time and refined their strategy. *Id.* at 1285:27–1286:6. Petitioner described the events that occurred upon his and Tyson's return to the farmhouse, including the fact that he remembered to wear his gloves, *id.* at 1286:16–19, that he gave Tyson instructions to disarm M. Vargas, *id.* at 1288:1–2; 1301:13–16, to bring M. Vargas upstairs, *id.* at 1288:26–1289:1, and to take Meza downstairs to "take care of her." *Id.* at 1289:27–28. Petitioner further testified that he "holler[ed], 'Where's the money' or something" to M. Vargas, *id.* at 1290:27–28; 1304:5–8, and then described in detail his murder and robbery of M. Vargas and S. Vargas. *See, e.g., id.* at 1290:16–1299:27. *See also infra* notes 25 & 26. Petitioner testified that after killing the men he instructed Tyson and Meza to view the corpses. *Id.* at 1300:4–14; 1301:19–20.

Petitioner's viewpoint of the subsequent kidnapping of Meza conflicts with Tyson's; each assert that the other instigated the kidnapping. Nevertheless, Petitioner's recall of his version of the events surrounding the incident is crystal clear. *Id.* at 1211:1–11. For example, he testified that before leaving the farmhouse with Meza he made a trip into the kitchen to collect her purse. *Id.* at 1302:17–25. This demonstrates Petitioner's presence of mind and foresight despite the fact that he had just murdered two men.

Petitioner testified that he drove to the mountains to "get away from any populated areas" so that he could "kill Lourdes [Meza]." *Id.* at 1312:1–4. Petitioner recalled that, while en route, he went through Meza's purse, took her money and threw photos of her four children out of the window. *Id.* at 1310:23–1311:8. He also recalled that two men on a motorcycle stopped at a light were asked if they "want[ed] some of this," "this" being Meza's forcibly bared breasts. *Id.* at 1307:12–26. Petitioner further recalled that at one point Meza attempted to escape, but that he was able to "backhand[ ] her, slap[ ] her or something" to regain control. *Id.* at 1210:2–3. Petitioner testified that despite his alleged intoxication he was able to get an erection and

mony of Tyson and K. Tyson [17], and the expert psychiatric opinion of Dr. Max Bran-nan.[18] Thus, clear and overwhelming evidence established that Petitioner was lucid,

have sexual intercourse with Meza. *Id.* at 1210:20–24.

Petitioner described murdering Meza, including the fact that he shot her four times. *Id.* at 1313:8–1314:9. *See infra.* notes 25 & 26. Petitioner then described ordering Tyson to retrieve the beer cans he had tossed from the car because they had "everybody's fingerprints on them," *id.* at 1314:20–28, hitting Tyson and calling him names because he was crying and sick, *id.* at 1316:3–18, driving back to Galt, *id.* at 1315:7–8, wanting to get some coffee, *id.* at 1315:27–1316:1, arriving back at Tyson's home, packing and leaving within minutes. *Id.* at 1317:12–20.

Petitioner described himself as a leader, stating, "I don't follow other people." *Id.* at 1253:13–23.

17. Tyson and K. Tyson testified that, two days before the incident, Petitioner spoke of killing the victims, RT Vol. IV 765:16–22; 774:5–12; 831:4–5; RT Vol. V 940:3–7; 940:22–941:2; robbing them, RT Vol. IV 774:26–775:1; 831:2–3; 831:7–9; RT Vol. V 946:24–947:2, and moving to Texas afterward. RT Vol. IV 775:11–776:4; RT Vol. V 945:5–13. They further testified that in preparation for the heist Petitioner cleaned both guns, RT Vol. IV 776:7–22; RT Vol. V 947:11–948:2, pawned a camera, passed bad checks and sent his ex-wife and her cousin to "hustle" or "pull tricks" for gas money to Merced, RT Vol. IV 777:3–6; 778:24–779:5; 779:16–24; 782:2–10; 782:11–23; RT Vol. V 951:26–952:19; 948:4–12, and allegedly threatened Tyson into being Petitioner's "cover up" or back up. RT Vol. IV 829:19–28; RT Vol. V 954:20–26; 1068:24–26. K. Tyson also testified that Petitioner target practiced on one occasion, RT Vol. IV 777:7–10; 777:24–25, and that he "was more in charge, where everybody just more or less followed him and agreed." *Id.* at 831:19–20.

The Tysons both testified that on the day of the murders, as Petitioner and Tyson were leaving for Merced, Petitioner returned to the house for a towel to cover his gun and for socks to use as gloves. RT Vol. IV 832:9–17; 832:26–27; RT Vol. V 955:17–26; 956:11–12; 1069:5–8.

Tyson further testified that upon reaching the Merced area, Petitioner and he stopped three times to ask for directions. RT Vol. V 957:1–7; 959:3–16; 960:17–24. While at the Franklin Tavern in Merced, Petitioner assigned Tyson the duty of "[c]overing people," *id.* at 957:26–958:8, during implementation of the plan.

Tyson's testimony also revealed that once at the farmhouse, Petitioner coherently made small talk, *id.* at 962:27–963:1; 963:4–5; and conducted business. *Id.* at 965:6–9.

Tyson's statements regarding the initial "throw down" of M. Vargas further substantiates Petitioner's testimony. *Id.* at 966:26–967:26. In addition, Tyson testified that while he and Petitioner were on the "beer run," Petitioner instructed him on the plan, *id.* at 968:7–15, and threatened to kill him if he did not go along with it. *Id.* at

967:27–968:6. Tyson also stated that Petitioner had devised a receptacle for Tyson's pocket made of masking tape in which bullets could be stored without rattling. *Id.* at 981:8–20.

Tyson testified that he and Petitioner donned their gloves before returning to the farmhouse, *id.* at 991:14–16, and that once inside, Petitioner told him to bring M. Vargas upstairs, *id.* at 971:12, take Meza downstairs, *id.* at 971:24–26, and shoot her. *Id.* at 972:3–7; 1094:8. He heard Petitioner yelling for the money, *id.* at 973:2–9, and then shots being fired. Shortly thereafter, Petitioner told Tyson to go upstairs and look at the bodies. *Id.* at 975:16–19; 1093:15–18.

Tyson testified that during the subsequent kidnapping Meza produced photos of her children which Petitioner threw out of the car. *Id.* at 985:28–16. Petitioner also tossed out the receipt he had written for the car. *Id.* 985:14–19. Tyson further testified that Petitioner wanted to get to a side road to "kill the girl." *Id.* at 988:2–15. After arriving at a sufficiently secluded spot, *id.* at 989:6–27, Petitioner coaxed Meza out of the car, presumably to have intercourse again, *id.* at 990:4–8, took her a short distance away, and shot her four times while Tyson remained in the car. *Id.* at 992:23–27; 994:10–17. Tyson testified that upon returning to the car, Petitioner told him to retrieve the beer cans he had discarded. *Id.* at 995:8–16. Tyson acknowledged being sick and that Petitioner hit him and called him names. *Id.* at 996:1–4. He also testified that Petitioner drove back to Galt, *id.* at 996:28–991:4; 1099:21–28, and had wanted to stop for food or coffee on the way. *Id.* at 996:6–12. Tyson further stated that Petitioner "mentioned that he should have—[the other people at the farmhouse] should have been taken out also." *Id.* at 997:18–21.

Tyson and K. Tyson testified that once back in Galt, Petitioner quickly divvied up the guns, RT Vol. IV 835:20–836:10; RT Vol. V 999:15–18, took all the cash from the robbery, RT Vol. IV 835:15–19; 834:28; RT Vol. V 1000:20–23, threatened them, RT Vol. V 998:11–14, packed, RT Vol. IV 834:6–17, and left.

18. With regard to Petitioner's drug use, Dr. Brannan, a court-appointed psychiatrist, testified that a person's "tolerance goes way up" if "he's using drugs all the time." RT Vol. VI 1333:11–12. On direct examination, Dr. Brannan testified as follows:

Q [R. Howard]: Well, then, Doctor, given what I've related to you insofar as the quantum of drugs and alcohol, the combination of this individual, would you be able to give an opinion as to whether it would affect his capacity, for example, to premeditate?

A: Well, from what you've said by rushing upstairs, assuming all that's true, walking rapidly, talking rapidly and not particularly slur-

not intoxicated, and not suffering from a diminished capacity at the time he committed the crimes. These factual findings were unaffected by counsel's alleged failure to investigate the diminished capacity defense. Furthermore, it is the court's determination that such findings remain unaffected notwithstanding the mental profile currently presented by Petitioner.[19] It is not reasonably probable that, but for the alleged errors, the jury would have reached a different verdict. Accordingly, relief is denied as to this portion of Claim B.

> ring his speech, and you can understand him, would make me think that he wasn't too intoxicated on any of the drugs.
> Q: All right.
> A: He may have had a lot, but he wasn't—the effect I'm saying wasn't great from what I· hear.
> *Id.* at 1341:7–17.
> When requested to explain his medical understanding of diminished capacity vis a vis Petitioner, the following exchange occurred:
> A: Well, if a man, his thinking ability is so clouded by any drug, so that he doesn't think clearly, doesn't think rationally, doesn't plan things as he ordinarily would, what we assume if he was in that condition that his ability to plan, premeditate and so on would be clouded to some extent.
> . . . .
> Q [R. Howard]: And so you'd say he would not have full capacity to do any of those things like premeditate, deliberate, harbor malice—
> A: If he was in that condition, yes.
> Q: And also with respect to forming· certain specific intent, for example, to rob and deprive someone of his property permanently, would that also affect that ability to form that intent?
> . . . .
> A: A fellow who is drinking and driving, he doesn't intend to get on the wrong freeway going the wrong way, but he frequently does. He doesn't intend to run into somebody, but frequently does. Doesn't intend to wreck his car, but he frequently does. Simply because of the involvement of drugs. But when he is in that condition, it's pretty obvious to most everybody around him.
> *Id.* at 1342:1–23.
> Dr. Brannan further stated on direct that a person suffering from an epileptic seizure would not have been able to accomplish the ·activities that Petitioner accomplished. *Id.* at 1343:8–1344:4.
> On cross examination, the doctor testified that: (1) a person who commits an act only because he is under the influence of drugs would not usually have memory of the act, but that Petitioner had been able to describe the murders to him, *id.* at 1348:1–7; (2) he would not expect a person who was as heavily under the influence of drugs as Petitioner allegedly was to be able to: (a) recall

## b. Sanity Phase—Insanity Defense

Petitioner alleges ineffective assistance of counsel at the sanity phase of his trial because his attorney failed to adequately investigate facts in support of his not guilty by reason of insanity plea. Counsel presented no sanity phase witnesses. Instead, Petitioner's attorney simply read the reports of the two court-appointed psychiatrists and the results of Petitioner's EEG into the record. Both psychiatrists concluded that Petitioner

> the details Petitioner did, *e.g.*, the fact that he wore gloves, the kind of weapon he used, the actions of others, *id.* at 1348:8–20; (b) drive as much and as fast as Petitioner did without an accident, *id.* at 1348:21–1349:2; (c) get an erection, *id.* at 1349:3–20; (d) remember to pick up Meza's purse or the beer cans, *id.* at 1351:18–1352:3; or generally, (e) "do any of these acts, I'm talking about driving successfully, intercourse, primarily, being heavily under the influence of these drugs." *Id.* at 1349:28–1350:2.
> When questioned by the prosecutor whether Petitioner could have formed the intent to kill at the time of the offense, Dr. Brannan replied:
> I don't have any—as far as the evidence I have, I would say "yes." Because I don't have any hard evidence except what he said. And what's been presented here this morning. Some things have been presented here this morning that have led me to believe he was not heavily under the influence of drugs.
> *Id.* at 1350:21–25.
> Later, in response to the prosecution's question about the importance of witness testimony regarding Petitioner's sobriety, Dr. Brannan reiterated that the "appearance of a person by a third person, a second person is important in determining the state of functioning that he's in mental and physical both." *Id.* at 1351:3–6.

**19.** Petitioner has submitted the declarations of Drs. David Smith and Joseph Satten in support of his position that the foregoing evidence supports a diminished capacity defense, that counsel's failure to obtain independent psychiatric experts resulted in the presentation of an incomplete and undeveloped diminished capacity defense, and that this failure precluded the assertion of other, valid mental state defenses, *e.g.*, unconsciousness, which were suggested by the psychiatric records. Dr. Smith diagnosed Petitioner as suffering from "neuropsychic impairment and acute alcoholism" and experiencing "toxic psychosis," Pet. 23:26–24:3, while Dr. Satten concluded that Petitioner suffered from "intermittent explosive disorder." Pet. 25:1–4. Both doctors concluded that at the time of the murders Petitioner was unable to formulate the requisite mental state.

**1462**

was sane. The results of the EEG were normal.

■ The record does not support Petitioner's supposition that, but for counsel's alleged error, it is reasonably probable the jury would have found him not guilty by reason of insanity. A criminal defendant has the burden of proving insanity by a preponderance of the evidence. Cal.Evid.Code §§ 115, 522. Petitioner has presented no evidence demonstrating that he could have met this burden. Consequently, it cannot be said that he suffered prejudice due to counsel's failure to investigate an insanity defense. Accordingly, this argument fails.

#### c. Penalty Phase—Mitigating Evidence

■ Petitioner alleges that his counsel rendered ineffective assistance at the penalty phase of his trial by failing to investigate and present facts in mitigation of the death penalty. Petitioner contends that counsel failed to discuss the penalty phase with him, and to present family members and friends to testify on Petitioner's behalf. Petitioner alleges that prejudice resulted from counsel's foregoing errors because certain available mitigating evidence was not presented to the jury, namely Petitioner's: (1) previous psychiatric treatment, including a voluntary admission to Clairemont Hospital (see supra note 13); (2) untreated hyperactivity as a child; (3) illegitimate birth; (4) poor childhood homelife, including an alcoholic mother and a mentally and physically abusive stepfather; and (5) failure to complete high school. Petitioner further contends that his mother, Lucille Smith, his step-sisters, Christine Smith and Kirby Smith Touvell, his daughter, Celeste, his step-son, Edward, and his friends Mary Begley, and Jean and Ron Torrey, would have testified favorably as to his character and personal history, and pleaded for his life.

The court finds that Petitioner suffered no prejudice as a result of counsel's alleged failure to investigate mitigating evidence. Petitioner argues that certain mitigating evidence was not presented to the jury. However, the jury was exposed to much of the evidence which he complains was omitted due to counsel's error. For example, although Petitioner complains that evidence regarding his short-term voluntary admission to Clairemont Hospital for psychiatric care was not before the jury, he ignores the fact that the jury was aware of a voluntary, three-month admission to the Scripps–Howard Institute for psychiatric care. RT Vol. VI 1356:8–19; RT Vol. VII 1522:10–13; 1525:2–5; 1534:11–14. Furthermore, the jury had evidence that Petitioner was illegitimate, RT Vol. VII 1523:6; 1532:22, had an unhappy childhood, including an abusive step-father and an alcoholic mother, id. at 1523:11; 1523:19; 1524:14–15; 1526:17–18; 1532:27–1533:2; 1533:10–11, ran away from home, id. at 1524:14–15; 1533:27–28, did not finish school, id. at 1523:15–18; 1533:7–12, suffered head injuries as a youth, RT Vol. VI 1172:13–25; RT Vol. VII 1534:8–10, abused drugs and alcohol from a very young age, RT Vol. VI 1173:1–1175:26; 1177:8–23; 1181:7–1188:18; 1190:5–15; 1192:26–1196:8; 1213:24–1214:2; RT Vol. VII 1524:2–9; 1535:1–4, had been treated for epileptic seizures, RT Vol. VI 1171:16–1172:8; 1180:3–7; 1356:19–22; RT Vol. VII 1522:10–16; 1525:14–22; 1534:15–21, and had suffered blackouts. RT Vol. VI 1356:23–27; RT Vol. VII 1525:6–8.

As sympathetic as are these mitigating factors and those few mentioned by Petitioner but not heard by the jury, they are simply overwhelmed by the aggravating factors that exist in this case.[20] Undoubtedly, Petitioner's commission of multiple murders during the course of a felony, his prior criminal activity involving the threat, use, or attempted use of force or violence, and Dr. Brannan's testimony that Petitioner was a sociopath and suffered no remorse, RT Vol. VI 1350:3–18, echoed so loudly in the minds of the jurors as to render them nearly deaf to the minuscule rustling of any mitigating evidence. Thus, it is not reasonably probable that the evidence presented by Petitioner to which the jury was not exposed would have

---

**20.** That the weight of the aggravating factors is staggering in comparison to any mitigating factors which were presented is supported by the jury's rendering of a quick penalty phase verdict.

The jury reached its death verdict in two hours and fifty minutes, which included down-time for a lunch break of indeterminate duration.

affected the jury's consideration of the aggravating and mitigating circumstances sufficient to lead to a verdict other than death. Accordingly, this argument fails.

### 2. Petitioner's Confessions

■ The record indicates that Petitioner made two taped confessions, one to the arresting Arizona deputies at 4:00 a.m. on November 24, 1978, prior to the arrival of the California law enforcement officers, RT Vol. V 1119:5–8; ROSC Exh. 2; *Williams*, 44 Cal.3d at 920, 245 Cal.Rptr. 336, 751 P.2d 395, and a second one to the California officers at approximately 11:00 p.m. on the same day. CT Vol. I 162, 188; RT Vol. V 1105:13–24; Trial Exh. 39. *See infra* note 26. The court admitted only the latter tape into evidence.

Petitioner contends that his counsel was ineffective at the guilt and penalty phases because he failed to move to suppress statements made following his arrest.[21] Petitioner asserts that because the state court record is silent as to whether the arresting Arizona officers *Mirandized* Petitioner prior to his initial interrogation and confession, a waiver of *Miranda* rights cannot be assumed and, pursuant to *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the subsequent interrogation by California officers is tainted regardless of any amendatory *Miranda* warning.

■ Petitioner's contention is without merit. The transcript of his first confession and the tape recording of the second confession clearly demonstrate that Petitioner was warned of, and waived, his *Miranda* rights. *See also* CT Vol. I 164; RT Vol. V 1106:8–26; *Williams*, 44 Cal.3d at 920, 245 Cal.Rptr. 336, 751 P.2d 395. Moreover, even if Petitioner had not been advised of his federal constitutional rights prior to the first confession, such an error has no impact on the validity of the second, properly *Mirandized*,

confession. *Westover* is not to the contrary.[22] Accordingly, because Petitioner's trial counsel committed no error by failing to file a formal motion to suppress Petitioner's statement on *Miranda* grounds, this argument fails.

### 3. The Tysons' Testimony

Tyson and K. Tyson testified against Petitioner at his trial. Petitioner now claims his trial counsel's failure to move to suppress the Tysons' testimony constitutes ineffective assistance at the guilt and penalty phases of his trial. Petitioner contends that the Tysons' testimony was "procured by unlawful police conduct and thus involuntary." Pet. 44:21–22. Specifically, Petitioner asserts that officers conducted a nonconsensual, warrantless search of the Tysons' home, and that their threats to unlawfully arrest K. Tyson and take away her kids caused Tyson to surrender.

■ Factual determinations made by the state court are entitled to a presumption of correctness. 28 U.S.C. § 2254(d). The factual determinations made by the California Supreme Court simply do not support Petitioner's assertions of an illegal search or of threats made to K. Tyson. As that court found:

> Karen telephoned a Stockton police officer from a telephone booth on Thursday, October 12, told the officer that she was with Tyson, and had talked him into surrendering on Friday. The affidavit in support of the complaint recites that Officers Harris and Hauser met with Karen at the Tyson home where she said she wanted to tell them everything.
>
> There is no support in this document or in Karen's testimony for defendant's claim that the officers' entry was nonconsensual, that a search of the home was conducted at

21. The record demonstrates that trial counsel initially objected to the admission of Petitioner's second confession on *Miranda* grounds, but later conceded the point. RT Vol. V 1123:5–11.

22. No "continuous period of questioning" condemned in *Westover* occurred in this case. Although two Arizona officers were present, Petitioner gave his second confession to California

law enforcement officers, CT Vol. I 182; RT Vol. V 1106:27–1107:5, after being taken into custody by the California officers, CT Vol. I 167, more than eighteen hours after the first confession, CT Vol. I 162; RT Vol. V 1105:13–24, and after being advised of, and waiving, his constitutional rights. Trial Exh. 39; CT Vol. I 164; 170; RT Vol. V 1106:8–26.

this time, or that if such search was undertaken it was without Karen's consent.

Tyson testified that when he met secretly with Karen prior to surrendering she told him that police officers had searched the house and had said that she could be arrested and prosecuted for aiding, abetting, being an accessory after the fact and for receiving stolen property. She told him that these officers, Harris and Hauser, had promised protection for her and her children if he surrendered. Again, nothing in this testimony supports the assertion that a search was conducted without a warrant or consent, that Karen was threatened, or that either her cooperation or her testimony was involuntary ...[16] ...[17]

---

[16] Defendant does not argue that the statement Tyson and Karen attribute to the investigating officers was untrue, or that there was no probable cause to arrest Karen.

[17] Defendant escalates an "implied" threat to take Karen's children from her, a threat nowhere mentioned in the record, into an actual threat, and on that basis argues that her cooperation was involuntary.

*Williams,* 44 Cal.3d at 919–20 & nn. 16–17, 245 Cal.Rptr. 336, 751 P.2d 395.

The *Williams* court further noted that evidence supplied by Respondent in response to this claim refuted Petitioner's allegations:

> [in] an excerpt from the reporter's transcript of the trial of Tyson ... Tyson confirmed that he had decided to give himself up and contacted Karen who said that she did not want to run. He therefore instructed her to get in touch with a detective he had met in the sheriff's office in Stockton.

*Id.* at 921, 245 Cal.Rptr. 336, 751 P.2d 395. *See also* ROSC Exh. 3 526:15–527:19.

Accordingly, as there existed no factual basis for a motion to suppress the Tysons' testimony, Petitioner's trial counsel was not remiss in failing to make a futile motion.[23]

---

**23.** The court notes that Petitioner's counsel knew that Tyson's attorney moved to suppress this evidence on similar, grounds at Tyson's trial and that said motion was denied. PX Exh. C R. Howard Decl. ¶ 20; ROSC Exh. 1 L. Howard Decl. ¶ 5.

## 4. The *M'Naghten* Instruction

■ Petitioner asserts that his counsel's failure to object to the trial court's *M'Naghten* instruction constituted ineffective assistance of counsel at the sanity phase of the trial. This claim is without merit. As discussed *infra* § III(J), although the trial court erred by including this instruction, such error did not violate due process. Moreover, as discussed *supra* § III(B)(1)(b), sufficient evidence of Petitioner's insanity is lacking. Consequently, it cannot be said that, but for the counsel's failure to object to this instruction, the jury would have found Petitioner insane.

## 5. Petitioner's Prior Criminal Record

■ Petitioner contends that counsel's failure to move to exclude or to object to the admission of evidence regarding his prior criminal record constituted ineffective assistance of counsel at the guilt and penalty phases of his trial. Petitioner's trial counsel elicited testimony from Petitioner regarding his prior convictions for grand theft, assault with a deadly weapon, and transportation of a stolen vehicle across state lines. RT Vol. VI 1188:22–1189:25. In addition, the prosecutor elicited testimony regarding an uncharged escape. RT Vol. VI 1217:25–26.

Petitioner's trial counsel believed that Petitioner's prior convictions were admissible to impeach his credibility. Accordingly, he "decided to bring out those convictions on direct examination so as to limit their potential impact on the jury." PX Exh. C R. Howard Decl. ¶ 18. Trial counsel "also believed that all of WILLIAMS' prior convictions were relevant to the diminished capacity defense in that each occurred during or following a period of drug or alcohol abuse." *Id.* at 6:2–4. This statement is in keeping with the Settled Statement signed by Petitioner's counsel, the prosecutor, and the trial judge, which reveals that "[a] Beagle [24] objection

---

**24.** In *People v. Beagle,* 6 Cal.3d 441, 99 Cal.Rptr. 313, 492 P.2d 1 (1972), the California Supreme Court determined that a prior felony used for impeachment must involve an element of dishonesty. *Beagle* was subsequently limited by *People v. Castro,* 38 Cal.3d 301, 313–17, 211 Cal.Rptr. 719, 696 P.2d 111 (1985) and superseded by constitutional amendment as acknowledged in

was not made, nor was the motion filed because of the trial strategy on the part of Defendant's counsel." SS 2:27–3:1.

Petitioner now argues that, had trial counsel moved to bar admission of evidence of his prior convictions and the uncharged escape, it is reasonably likely that such a motion would have been granted because "[u]nder applicable California standards, Defendant's prior convictions were remote and irrelevant to any of the factual issues in dispute at trial [and] . . . were highly prejudicial to Petitioner's defense." Pet. 49:17–24.

The failure of Petitioner's trial counsel to move to suppress or to object to the admission of those prior convictions which involved an element of dishonesty was not error. California law provided for the admission of such evidence to impeach a felon-witness. Federal law is in accord. Fed.R.Evid. 609(a)(2).

Furthermore, with regard to those prior convictions which do not involve an element of dishonesty, "the defendant must overcome

the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Petitioner has failed to demonstrate that counsel's strategy in introducing said convictions was not sound. As noted, counsel set forth Petitioner's criminal background to demonstrate that mental illness, defect or disease, or drug intoxication reduced Petitioner's capacity to harbor the specific mental elements of the charged offenses. Given the difficult factual circumstances with which counsel was confronted, the court finds this strategy reasonable and counsel's performance adequate under the Constitution.

■ Even if the court were to find counsel's performance constitutionally inadequate, Petitioner was not prejudiced thereby. Petitioner testified to killing his three victims.[25] Furthermore, the prosecution played the audio tape of Petitioner's confession for the

---

*People v. Wheeler*, 7 Cal.App.4th 1728, 281 Cal. Rptr. 758, 760 n. 3 (1991), *aff'd* 4 Cal.4th 284, 14 Cal.Rptr.2d 418, 841 P.2d 938 (1992).

**25.** Petitioner testified on direct examination as follows:

Q [Roland Howard]: Had you agreed before you entered the farmhouse that the three should be killed for whatever reason?
A: We had—we had spoken of that, yeah.
. . . .
Q: All right. Now Miguel and Salvador were down on the floor on the [upstairs] landing [of the farmhouse] and Tyson apparently took the girl downstairs then.
A: (Defendant nods head).
. . . .
Q: Now how did they get inside the bedroom?
A: Miguel—yeah, Miguel, made a—I don't know, like—I was hollering, "Where's the money" or something. I don't know. I was just, you know, things were just starting to really happen right then. And Miguel made a lunge like he turned and he had a gun. And I shot him.
. . . .
Q: Now what about Salvador?
A: Well, when the first shot went off, he started crawling like, you know, trying to get into the bedroom. And then I shot him, too. RT Vol. VI 1290:5–7; 1290:16–18; 1290:26–1291:3; 1291:16–19.
The following colloquy occurred on cross-examination:
Q: [Larry Howard]: . . . at some point you said that Miguel had turned and he had a

weapon at that time and it was at that time that you shot him.
A: Yes, sir.
. . . .
Q: Did he fire that gun?
A: No, he didn't.
Q: It was then that your weapon fired.
A: Yes, sir.
. . . .
Q: So you fired once at Miguel and then you fired at Salvador.
A: Twice.
Q: Twice at Salvador.
A: (Defendant nods head.)
. . . .
Q: You fired twice in rapid succession, apparently at Salvador and apparently at some time you fired again towards Miguel.
A: Yes, sir.
Q: And when did you do that?
A: Right after I had shot Salvador.
. . . .
Q: Now you said something earlier in your testimony when you left the farmhouse you wanted to go to the mountains.
A: Yeah.
Q: And why did you want to go to the mountains?
A: To get away from—just get away from any populated area.
Q: The reason to get away from a populated area was what?
A: It was to kill Lourdes.
RT Vol. VI 1294:10–13; 1295:11–14; 1296:3–6; 1297:9–13; 1311:26–1312:4.

**1466**

jury.[26] Thus, the jury heard overwhelming evidence of the fact and manner of the three murders. The nature of Petitioner's prior criminal record simply pales in comparison to the egregious facts surrounding this triple-murder. As a result, it simply is not reasonably probable that, but for counsel's alleged errors, the result of the guilt or penalty phases would have been different.

### 6. Dual Purpose of Psychiatrists' Appointment

Petitioner argues that counsel's failure to move or object to the appointment of psychiatrists for the dual purpose of determining Petitioner's competency and sanity constituted ineffective assistance of counsel because it precipitated the introduction and admission of statements made during the competency evaluation which were excludable.

█ Incriminating statements made during a court-ordered competency examination are subject to exclusion. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *See also People v. Arcega,* 32 Cal.3d 504, 521–22, 186 Cal.Rptr. 94, 651 P.2d 338 (1982); *Tarantino v. Superior Court,* 48 Cal. App.3d 465, 469–470, 122 Cal.Rptr. 61 (1975). On the other hand, incriminating statements made during a **voluntary** psychiatric examination held for the purpose of establishing a diminished capacity or insanity defense are not compelled within the meaning of the Fifth Amendment.

█ Petitioner's argument that counsel failed to render effective assistance for fail-

ing to object to the bases for the appointment of the psychiatrists is without merit. First, although the trial court checked every box on the appointment form, CT Vol. I 194; RT Vol. I 13:14, Petitioner's competency to stand trial was never seriously in issue. *Williams,* 44 Cal.3d at 933, 245 Cal.Rptr. 336, 751 P.2d 395. *See also* ROSC Exh. 1 4:14–17. This is evidenced by, *inter alia,* the fact that proceedings pursuant to Cal.Penal Code §§ 1368–1369 were not invoked. Consequently, counsel's failure to object to the "dual" appointment was not error.

Second, assuming, *arguendo,* that error occurred, no prejudice resulted therefrom. Petitioner identifies no portion of the record where information regarding competency, but not pertaining to diminished capacity or insanity, was admitted. In fact, Petitioner points to no competency examination statements that were introduced into evidence despite being excludable. Consequently, it is not reasonably probable that, but for counsel's alleged error, the jury would have reached a different result at any phase of the trial. Accordingly, this argument fails.

### 7. Psychiatric Reports; Limiting Instruction

█ Petitioner alleges ineffective assistance due to his counsel's reading of the unredacted psychiatrists' reports at the sanity phase. He further alleges error in the penalty phase resulting from counsel's failure to request a limiting instruction to the effect that inadmissible and potentially inflammatory statements made by Petitioner and includ-

---

26. Subsequent to his arrest, Petitioner made the following taped statement:

Q [Officer]: Okay, 'kay, just, in your own words, go ahead and tell me your side of the story. Now we, we're talking about, uh, what happened to the people up there in Merced.
. . . .
A: So, we went up there [to the farmhouse] and, uh, went in—first there was a bunch of people there.
Q: Mm hmm.
A: We had something to drink. We was drinking and stuff and uh . . .
Q: Mm hmm.
A: We left and (yawn) went back about a half-hour later and everyone was gone except for, uh, these two dudes and this chick. Uh, killed the two dudes upstairs in the bedroom.
Q: Mm hmm. Who killed them?

A: I did.
. . . .
A: So, uh, you know, I, I s—I started to shoot her there, but like, it was like [Tyson] was gettin' all freaked out and everything.
Q: Mm hmm.
A: So, I told him to grab her. He grabbed her. I said "Get in the back seat with him, you know, with her . . ."
Q: Mm hmm.
A: . . . and we left. We went up by Sonora in the mountains—was up, I don't even know, you know, exactly where it's at. It's up by Sonora.
Q: Mm hmm.
A: And, uh, killed her.
Q: Mm hmm. Who, uh, who, who killed her?
A: I did.

ed in the psychiatric reports were to be considered only for establishing the bases of the psychiatrists' opinions and not for the truth of the matter asserted.

Petitioner challenges his attorney's introduction of the following statements of the psychiatrists:

'He said that if he had his way he would call off this whole bunch of crap. He said he thinks this whole trip is a bunch of shit. He said he would just like to get it over with and take what is coming to him.'

'He does not think jail will do him any good, but he is not saying he wants to go to a hospital. He said jail is not hard on him but out there is hard on him.' ·

'He said he does not understand what is going on out there.'

'He has been in institutions off and on with some regularity for more than half of his lifetime, since he was 13 years of age....'

'He sums it up by telling me that, one, he rejects authority and always will. Two, he does not go for the rehab bullshit. Three, he goes by the same code of ethics whether he is inside or outside of jail. Four, he is very prejudiced against Mexicans....'

'... he ...·could commit the same offense again toward others or himself, in fact he says this himself.'

Pet. 41:10–26. Petitioner also challenges the psychiatrists' following statements:

'He said he was in jail because he attacked a drunk and cut him up.'

'He said that as a juvenile he was arrested for, one, being a runaway; two, grand theft auto; three, burglary; four, assault with·a deadly weapon.'

'He said as an adult he had been arrested for, one, assault with a deadly weapon; two, grand theft auto; three, armed robbery; four, parole violation; five, he was

arrested about twelve times, he thinks....'

'He said he would blow up and jump on two dudes ...'

. . . .

'Once before, I'd been drinking all day and I cut a junkie up. In the joint, I stayed mad the same way. I'm pretty anti-social, I guess.'

'I think it was something that was building up in me. Prior to that, I had almost killed three people in an armed robbery. The night before, I had almost killed my old lady. I was just pretty crazy.'

'I've attacked other people, assaults, it's been the same every time. I don't think I'm crazy, but something's not right when you just shoot three people for the fuck of it because you're pissed off. I've jumped on my stepdad. I've jumped on a lot of people with the intent to hurt them....'

'I'd blow it a lot. I've got a past history of a lot of violence, blowing up, bad temper.'

Pet. 50:25–51:26.

The court finds that it is not reasonably probable that, but for counsel's performance, the jury would have reached a different sanity phase verdict. As stated ·supra § III(B)(1)(b), Petitioner has presented no evidence demonstrating that he could have carried the burden of proving insanity. Consequently, he suffered no prejudice in the sanity phase due to counsel's alleged errors.

 Similarly, Petitioner suffered no prejudice at the penalty phase. Guilt phase evidence [27] enabled the jury to construct a clear profile of Petitioner. This profile was simply echoed by the specific statements that Petitioner now challenges. In other words, the challenged statements, though perhaps **factually** new to some extent, were **substantively** familiar to the jury and therefore cumulative of the guilt phase evidence.[28] The

27. Cal. Penal Code § 190.4(d) provides, and the trial court instructed, that the jury was to consider guilt and sanity phase evidence in determining Petitioner's penalty. RT Vol. VII 1613:3–7.

28. Some of the challenged statements were expressly presented to the jury during the guilt phase, such as those statements regarding, *e.g.*,

Petitioner's criminal record and his violent nature. Moreover, all of the challenged statements were substantively before the jury during the guilt phase. Guilt phase evidence established that Petitioner was utterly disdainful of society's laws and unwilling to conform his conduct thereto. Petitioner's statements that he follows his

substantive reiteration of this evidence was not prejudicial because it is not reasonably probable that, but for counsel's alleged errors, the jury would have reached a different penalty phase verdict. This argument therefore fails.

Accordingly, the court denies relief as to all aspects of Claim B.

### C. Claim C

██ Petitioner contends that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because he was denied a competent psychiatrist and a competent psychiatric examination to aid in the evaluation, preparation, and presentation of his mental state defenses advanced at trial. Specifically, Petitioner asserts a due process violation because his court-appointed psychiatrists were allegedly incompetent as evidenced by their lack of familiarity with his drug and alcohol intoxication and their subsequent rendering of unhelpful opinions, and that their incompetence deprived him of the psychiatric assistance mandated by *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[29]

In *Ake,* the Supreme Court determined that:

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense.

*Id.* at 83, 105 S.Ct. at 1096. The Court also recognized that psychiatry is not an exact science and that "psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms,

and on cure and treatment." *Id.* at 81, 105 S.Ct. at 1095.

Although the *Ake* Court indicated that a defendant is entitled to a "competent psychiatrist," it did not set forth a standard for determining the level of competence mandated by the Constitution. The Ninth Circuit has recently provided guidance on this issue.

In *Harris v. Vasquez,* 949 F.2d 1497 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992), the petitioner argued "that he was denied access to a qualified psychiatrist who 'conducts professionally competent examinations of the defendant and who on this basis provides professionally competent assistance.'" *Id.* at 1516 (quoting Appellant's Brief at 15). The petitioner in *Harris* specifically argued that such psychiatric assistance was required by *Ake*'s due process holding. *Id.* The Ninth Circuit disagreed. In concluding that no *Ake* violation occurred, the *Harris* court adopted the reasoning of the Seventh Circuit in *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991):

> we would be reluctant to open up this type of *Ake* claim to a battle of the experts in a "competence" review. Every aspect of a criminal case which involves the testimony of experts could conceivably be subject to such a review—a never ending process.... *A conclusion to the contrary would require this court and other federal courts to engage in a form of "psychiatric medical malpractice" review as part-and-parcel of its collateral review of state court judgments. The ultimate result would be a never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis.* We do not believe this was the intent of the Court in *Ake* when it held that indigent defendants who raise a defense of insanity are entitled to psychiatric assistance in the preparation of their defense.

own code of ethics whether he is in or out of jail, that he rejects authority, that he is antisocial, and that he does not believe in rehabilitation reiterate the guilt phase evidence already before the jury.

**29.** Petitioner has provided the court with the declarations of Drs. Joseph Satten and David

Smith in support of his argument. *See* PX Exh. G; TV Exhs. J–K; Petitioner's Req. Supp. Decls.; 2PHC Exh. B. Both doctors reached conclusions contrary to Drs. Brannan and Lloyd. *See supra* notes 18 & 19.

*Harris,* 949 F.2d at 1517–18 (emphasis added by Ninth Circuit).

The Ninth Circuit also determined that "*Ake* does not guarantee access to a psychiatrist 'who will reach only biased or favorable conclusions.'" *Id.* at 1516 (quoting *Granviel v. Lynaugh,* 881 F.2d 185, 192 (5th Cir.1989), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990)).

In accordance with *Harris,* this court refuses to engage in a battle of psychiatric experts and "place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas process." *Id.* at 1518. Petitioner entered a plea of not guilty by reason of insanity and the Merced County Superior Court appointed two psychiatrists, Drs. Brannan and Lloyd, to examine him. Thus, Petitioner had access to two psychiatrists prior to his trial.

Both psychiatrists interviewed Petitioner and reviewed pertinent materials. RT Vol. VI 1328:18–20; 1329:1–17; RT Vol. VII 1521:20–21; 1530:11–13; 1530:18–22. Further, Petitioner provided both doctors with, *inter alia,* his history of drug use, head injuries, blackouts and prior psychiatric illnesses. *See, e.g.,* RT Vol. VI 1356:8–1357:5; RT Vol. VII 1522:10–23; 1524:2–9; 1524:27–1525:8; 1525:12–22; 1531:1–28; 1534:8–1535:4.

At no time has Petitioner attacked the credentials of either doctor. In fact, Petitioner utilized the services of both doctors; he offered Dr. Brannan's testimony at the guilt phase and read the reports of both doctors into the record at the sanity phase.

Thus, because Petitioner had access to, and received, the assistance of two psychiatrists, no *Ake* due process violation occurred. Relief as to this claim is therefore denied.

### D. Claim D

Petitioner alleges that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendments rights by admitting evidence of the theft of Terry Judd's (Judd) gun and tools,[30] and the robbery and subsequent arson of a camper,[31] both of which were uncharged crimes. Additionally, Petitioner alleges that the trial court violated his constitutional rights by utilizing an impermissibly vague statute, Cal.Penal Code § 190.3(b), at the penalty phase. Finally, Petitioner contends that the trial court violated his constitutional rights at the penalty phase by arbitrarily depriving him of a state criminal procedure.

#### 1. Admission of Uncharged Crimes Evidence

 The Supreme Court has repeatedly stated that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990). "A habeas petitioner who challenges a state court's admission into evidence of prior acts of misconduct is not entitled to habeas corpus relief unless the state court's admission of this evidence violated petitioner's federal due process right to a fair trial under the Constitution." *Gordon v. Duran,* 895 F.2d 610, 613 (9th Cir.1990). Consequently, to obtain federal habeas relief Petitioner must demonstrate that the state law error "rendered the trial so 'arbitrary and fundamentally unfair' that it violated federal due process." *Pennywell v. Rushen,* 705 F.2d 355, 357 (9th Cir. 1983) (quoting *Powell v. Spalding,* 679 F.2d 163, 166 (9th Cir.1982)).

#### a. The Judd Theft

As noted, the first uncharged offense involved the theft of a gun and tools from Judd. The jury learned about this uncharged crime from the prosecutor's opening and closing statements, RT Vol. III 454:10–455:5; 455:18–21; RT Vol. VII 1449:2–7; 23–27; 1450:4–8, and from the testimony of Judd, RT Vol. III 487:21–26; 489:9–21; 490:10–22; 491 22–24, K. Tyson, RT Vol. IV 736:12–26, Tyson, RT Vol. V 895:4–10; 897:4–7; 899:5–7; 900:9–901:11; 902:7–12, and Peti-

---

**30.** Petitioner and Tyson worked for Judd in Corning, California for approximately one week in September, 1978.

**31.** Petitioner admitted to stealing and robbing a camper with Tyson on September 30, 1978. They subsequently burned the camper on October 2, 1978.

tioner. RT Vol. VI 1220:5–1221:28; 1224:13–17; 1224:25–1225:4; 1226:28–1227:6.

Petitioner's commission of this offense was not a hotly contested issue upon which the jury was required to deliberate. In fact, this issue was not disputed; Petitioner readily acknowledged his participation in this uncharged crime and admitted that his actions were wrong, RT Vol. VI 1220:5–12; 1221:9–15; 1224:13–17, 1224:24–28, thereby diminishing the effect of the admission of this evidence.

■ However, assuming, *arguendo*, that the trial court improperly admitted evidence of this comparatively minor uncharged crime, Petitioner has failed to demonstrate that its introduction violated due process. The admission of evidence of alleged prior acts of misconduct does not necessarily deprive a defendant of due process. *Gordon*, 895 F.2d at 613. As the Ninth Circuit determined in *Gordon*, the following factors aid in determining whether a due process violation occurred due to the admission of such evidence: (1) the trial judge's limiting instructions; (2) the relevance of the evidence; and (3) the jury's ability to weigh the witnesses' credibility. *Id.* At least two of these factors are present here.

■ First, the trial court instructed the jury that evidence tending to show that Petitioner committed a crime other than that for which he was on trial could be considered, not for proving criminal disposition, but only for the limited purpose of establishing identity, motive, intent, knowledge, or *modus operandi*. RT Vol. VII 1408:1–23. Second, the jury had the opportunity to weigh the credibility of all persons proffering evidence. Third, although the California Supreme Court found this evidence irrelevant, the court reiterates that Petitioner, as well as the state, presented testimony regarding this uncharged crime, thereby diminishing any controversy over its admission. Thus, application of the *Gordon* factors leads the court to conclude that admission of this evidence did not render Petitioner's trial arbitrary or fundamentally unfair in violation of due process.

### b. The Camper Robbery/Arson

■ The second uncharged offense involved the robbery and subsequent arson of the camper. The jury learned of this uncharged crime from, *inter alia*, Petitioner's taped confession, RT Vol. V 1136:10, and his trial testimony. RT Vol. VI 1232:17–1235:5; 1235:23–1236:6.

Once again, application of the *Gordon* factors demonstrates that admission of this evidence did not violate Petitioner's right to due process. First, the trial judge cautioned the jury that it was only to consider evidence of this uncharged crime for the limited purpose of:

> determining if it tends to show the identity of the person who committed the crime, if any, of which the Defendant is in this trial is [sic] accused, and the existence of the intent which is a necessary element of the crime charged and a characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme alleged to have been used in the commission of the offense in this case.

RT Vol. IV 756:26–757:4.

Moreover, the jury had the opportunity to weigh the credibility of the witnesses who testified concerning the uncharged crime.

Finally, the circumstances and evidence of the robbery/arson were relevant to Petitioner's identity and intent. Petitioner apparently burned the camper to destroy evidence connecting him to its robbery. He later used a check stolen from the camper to purchase M. Vargas' car. Consistent with his desire to conceal his involvement in the robbery and arson of the camper, Petitioner, in travelling to Merced, intended to retrieve the check from M. Vargas. Petitioner subsequently committed murder to, *inter alia*, reclaim the check. These actions reflect Petitioner's efforts to prevent authorities from discovering his participation in these crimes, and demonstrates the relevance of this evidence. Therefore, no due process violation resulted from the admission of this evidence.

### 2. Vagueness

■ Petitioner contends that Cal.Penal

Code § 190.3(b) [32] is unconstitutionally vague because it does not require a jury instruction enumerating the discrete criminal offenses to be considered, the elements of said offenses, or the standard of proof which must be met before the jury may consider such offenses. Petitioner contends that, consequently, the jurors were free to weigh, in aggravation, any of Petitioner's alleged conduct they viewed as criminal, and determine his sentence in a wholly arbitrary and capricious manner.

Petitioner's vagueness argument is unpersuasive. The Supreme Court has upheld the constitutionality of the California death penalty scheme, including § 190.3(b), pursuant to which Petitioner was sentenced. *California v. Brown*, 479 U.S. 538, 540 n. *, 107 S.Ct. 837, 838 n. *, 93 L.Ed.2d 934 (1987); *Pulley v. Harris*, 465 U.S. 37, 53–54, 104 S.Ct. 871, 880–881, 79 L.Ed.2d 29 (1984); *California v. Ramos*, 463 U.S. 992, 1005 n. 19, 103 S.Ct. 3446, 3455 n. 19, 77 L.Ed.2d 1171 (1983). The *Harris* Court specifically found that:

> [b]y requiring the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small subclass of capital-eligible cases. **The statutory list of relevant factors, applied to defendants within this subclass, "provide[s] jury guidance and lessen[s] the chance of arbitrary' application of the death penalty guaran-**

tee[ing] that the jury's discretion will be guided and its consideration deliberate."
*Harris*, 465 U.S. at 53, 104 S.Ct. at 881 (quoting *Harris v. Pulley*, 692 F.2d 1189, 1194–95 (9th Cir.1982) *rev'd*, *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)) (emphasis added). Accordingly, habeas relief for this aspect of Claim D is denied.

### 3. Deprivation of a State Criminal Procedure

■ In a closely related allegation, Petitioner contends that the trial court violated his constitutional rights by failing to instruct the jury that, in determining his sentence, it could not properly consider the aforementioned uncharged crimes evidence as aggravating circumstances unless it first found these crimes were proven beyond a reasonable doubt. Petitioner's argument, which relies on *People v. Robertson*, 33 Cal.3d 21, 53–55, 188 Cal.Rptr. 77, 655 P.2d 279 (1982), *cert. denied*, *Robertson v. California*, 493 U.S. 879, 110 S.Ct. 216, 107 L.Ed.2d 169 (1989), lacks merit.

As noted above, alleged errors of state law do not provide a basis for federal habeas relief. When a state law error is asserted, the duty of a federal habeas court is to determine whether the petitioner received due process of law. Given the California Supreme Court's holding that Petitioner was not deprived of a state court procedure,[33] and

---

**32.** Section 190.3 provides in part:

In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:

. . . .

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

**33.** In *Robertson*, the California Supreme Court concluded that the trial court's failure to give a reasonable doubt instruction regarding the other crimes evidence required a reversal of the penalty judgment. *Id.* 33 Cal.3d at 55, 188 Cal.Rptr. 77, 655 P.2d 279. The same court, however, explicitly refused to find error with the trial court's failure to give such an instruction in Petitioner's case. *Williams*, 44 Cal.3d at 958–59, 245 Cal.Rptr. 336, 751 P.2d 395. In *Williams*, the California Supreme Court applied Justice Broussard's concurrence in *Robertson* and held

that "the court had no obligation to instruct the jury here that this evidence, introduced by defendant, could not be considered an aggravating factor unless proved beyond a reasonable doubt, but could be considered in mitigation under a lesser standard." *Id.* at 959, 245 Cal.Rptr. 336, 751 P.2d 395. Thus, according to the California Supreme Court, the state law procedure announced in *Robertson* is inapplicable to Petitioner's case.

This court is bound by the California Supreme Court's interpretation of the applicability of the rule set forth in *Robertson*. *See Chavez v. Dickson*, 280 F.2d 727, 731 n. 3 (9th Cir.1960), *cert. denied*, 364 U.S. 934, 81 S.Ct. 379, 5 L.Ed.2d 366 (1961) (adopting the principle that "[f]ederal courts are bound by the interpretation placed upon the statute of a state by its highest court"). The court's inquiry is, therefore, limited to determining whether the penalty proceeding comported with due process, and whether the penalty was constitutionally imposed.

because no other evidence suggests that Petitioner's penalty phase was fundamentally unfair or his sentence unconstitutionally imposed, federal habeas relief is denied.

Accordingly, Claim D is denied in its entirety.

### E. Claim E

Petitioner alleges his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because the trial court and county government "interfered" with defense counsel's ability to prepare and present a defense, thereby denying Petitioner's right to due process, and because defense counsel was burdened with a conflict of interest, thus denying Petitioner's right to effective assistance of counsel.

#### 1. Due Process

As discussed *supra* § III(B)(1)(a), Petitioner's trial counsel was not aware of, and did not make a motion for funds pursuant to, Cal.Penal Code § 987.9. Nonetheless, Petitioner contends that the county government and trial court "impermissibly interfered with trial counsel's ability to prepare and present a defense ... by appointing trial counsel ... and then denying him any funds for ancillary defense services." Pet. 68:12–17. In support of this contention Petitioner submits that his trial counsel made two informal inquiries regarding defense funds, one to the trial judge and one to the court administrator. From the trial judge's response to his inquiry, counsel received "the impression that no such funds were available." Pet. 69:22. Similarly, the court administrator told counsel that "the entire yearly budget for contract attorneys had been expended and that no money was available for Petitioner's case." Pet. 69:25–70:1.

The court recognizes that "the effective assistance of counsel guarantee of the Due Process Clause requires, when necessary, the allowance of investigative expenses or appointment of investigative assistance for indigent defendants in order to insure effective preparation of their defense by their attorneys." *Mason v. Arizona*, 504 F.2d 1345, 1351 (9th Cir.1974), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975).

*See also Smith v. Enomoto*, 615 F.2d 1251 (9th Cir.1980), *cert. denied*, 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1980). "[H]owever ... such assistance is not automatically mandatory but rather depends upon the need as revealed by the facts and circumstances of each case." *Id.* at 1352.

Petitioner's counsel revealed no need for defense assistance to the appropriate authority and, consequently, said authority had no occasion or opportunity to consider and grant or deny a request for funding. Thus, neither the county government nor the trial court violated Petitioner's right to due process by "impermissibly interfer[ing]" with counsel's ability to prepare and present a defense. Accordingly, this portion of Claim E fails.

#### 2. Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel suffered a conflict of interest because "he was placed in the position whereby he had to personally pay for ancillary defense services, or forego the use of such services." Pet. 68:19–21. Counsel's decision to forego paying for such services allegedly "led to a series of acts, failures and omissions during the pretrial, trial and penalty phases which severely prejudiced Petitioner at trial and on appeal." Pet. 70:11–13. The court disagrees.

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an **actual conflict** of interest **adversely affected** his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980) (emphasis added). *Cuyler* applies to conflicts between a client and his attorney's personal financial interest. *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

If a defendant satisfies the *Cuyler* test, he has established a Sixth Amendment violation; no independent showing of prejudice is required. *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067. However, "until a defendant shows that his counsel actively repre-

sented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719.

■ Petitioner has failed to show that his defense counsel "actively represented conflicting interests." Although the Sixth Amendment guarantee of effective assistance of counsel includes the collateral right to counsel's undivided loyalty, *Mannhalt*, 847 F.2d at 579; *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1251–52 (9th Cir.1989), *cert. denied*, 493 U.S. 872, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989), counsel's duty of loyalty does not impose an ancillary obligation to personally finance his client's defense investigation and/or expert costs. In other words, no conflict of interest existed. Counsel's failure to financially support Petitioner's defense does not constitute a violation of his duty of loyalty or of Petitioner's Sixth Amendment right to effective assistance of counsel. As a result, this argument fails.

For the foregoing reasons, relief as to Claim E is denied.

### F. Claim F

Petitioner alleges that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by denying his motion to change venue and then failing to conduct "meaningful" voir dire, thereby denying his right to due process and a fair and impartial jury. Petitioner also alleges that his due process rights were violated by reason of an incomplete record.

#### 1. Change of Venue

Petitioner moved for a change of venue on the ground that he was prejudiced by pretrial publicity. In support of his motion, Petitioner supplied the trial court with copies of twenty-four print and broadcast stories published between October 10, 1978, and December 14, 1978. The trial court denied the motion without prejudice. Petitioner renewed his motion on the third day of jury selection, and the court again denied the motion. Petitioner now argues that the court's ruling was in error.

■ The standards governing a change of venue derive from the Due Process Clause of the Fourteenth Amendment which safeguards a defendant's Sixth Amendment right to be tried by a fair and impartial jury. *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988), *cert. denied*, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990). Due process requires a change of venue if the trial court is unable to seat an impartial jury because of prejudicial pretrial publicity. *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963); *Harris*, 885 F.2d at 1361. The court must independently examine the news reports for volume, content and timing to determine if they were prejudicial. However, "[a] state trial court's findings of fact with respect to the prejudicial effect of pretrial publicity are presumed to be correct and will not be set aside unless the error is manifest." *Harris*, 885 F.2d at 1365 (citing *Patton v. Yount*, 467 U.S. 1025, 1031 n. 7, 104 S.Ct. 2885, 2889 n. 7, 81 L.Ed.2d 847 (1984); *Irvin v. Dowd*, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)).

■ The Ninth Circuit utilizes a two prong test to determine if a petitioner's rights to due process and a fair and impartial jury have been violated by excessive and unfair publicity. *Harris*, 885 F.2d at 1361. *See also Hart v. Stagner*, 935 F.2d 1007, 1014 (9th Cir.1991). A petitioner must show that prejudice should be presumed or that actual prejudice existed. *Hart*, 935 F.2d at 1014 (citing *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)); *Harris*, 885 F.2d at 1361.

■ A court may presume prejudice if the record demonstrates that the trial venue was saturated with prejudicial and inflammatory publicity about the crime. *Harris*, 885 F.2d at 1361. Prejudice is presumed only in extreme circumstances. *Id.; Jeffries v. Blodgett*, 974 F.2d 1179, 1187 (9th Cir.1992).

■ The court has read the articles and transcripts submitted by Petitioner's trial counsel in support of the motion to change venue and concludes that the record does not reflect a "general atmosphere in the community or courtroom [which] is sufficiently inflammatory" and prejudicial to deny Petition-

er his right to a fair and impartial jury at either the guilt or penalty phase of the trial. *Harris,* 885 F.2d at 1363 (quoting *Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037). Only a limited number of stories, twenty-four, was published. Furthermore, all of the articles were published months prior to the March 20, 1979, trial date; eighteen (78.25%) were published in October of 1978, and six (21.-75%) were published in November and December of 1978. Moreover, the articles were factual in nature,[34] and a majority of them was very brief. Last, many stories focussed on Tyson for the simple reason that authorities apprehended and tried him first; one story did not even mention Petitioner by name. Thus, the record demonstrates that the trial venue was not saturated with prejudicial publicity. Consequently, prejudice may not be presumed in this situation.[35] *Jeffries,* 974 F.2d at 1187.

■ Actual prejudice exists if jurors demonstrated actual partiality or hostility that could not be laid aside. *Hart,* 935 F.2d at 1014 (citing *Harris,* 885 F.2d at 1361 (citing *Murphy,* 421 U.S. at 800, 95 S.Ct. at 2036)). As discussed in detail *infra* § III(F)(2), the record shows that neither the venire nor the petit jury demonstrated actual prejudice against Petitioner. Thus, Petitioner has failed to demonstrate prejudice by reason of the trial court's denial of his motion to change venue.

### 2. Voir Dire

Petitioner argues that the trial court's "open court" voir dire and its "perfunctory" manner of questioning the venire, particularly with regard to pretrial publicity, violated his right to due process and a fair and impar-

tial jury. Petitioner assigns error to the trial court's failure to conduct an "individualized and sequestered" voir dire, to inquire as to what each juror had read about the case, and to make an independent determination of juror impartiality. Petitioner specifically criticizes the trial court for "rel[ying] upon the jurors' professions of impartiality." Pet. 76:3–4.

### a. The Trial Court's Method of Voir Dire

■ Actual prejudice exists if venirepersons/jurors demonstrated actual partiality that could not be laid aside. *Hart,* 935 F.2d at 1014 (citing *Harris,* 885 F.2d at 1361 (citing *Murphy,* 421 U.S. at 800, 95 S.Ct. at 2036)). "The constitutional standard that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court is a question of federal law." *Patton,* 467 U.S. at 1037 n. 12, 104 S.Ct. at 2891 n. 12 (citing *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643). *See also Harris,* 885 F.2d at 1361. However, "whether a juror can in fact do that is a determination to which habeas courts owe special deference." *Patton,* 467 U.S. at 1037 n. 12, 104 S.Ct. at 2892 n. 12 (citing *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983)).

Qualified jurors need not be totally ignorant of the facts and issues involved in a case. *Murphy,* 421 U.S. at 799–800, 95 S.Ct. at 2035–2036; *Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642. The relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of, or appropriate punishment for, the

---

34. The factual media coverage consisted of the circumstances surrounding the murders, including the motive for the "execution-style" killings, the charges, the circumstances of Petitioner's arrest, Petitioner's criminal record and the fact that he was wanted for armed robbery, the sheriff's statement that Petitioner was armed and dangerous, a reference to K. Tyson's grand jury testimony which indicated that Petitioner had premeditated the murders, and the general progression of the investigative and court cases against Petitioner. Even those excerpts of articles which could arguably be called inflammatory, *e.g.,* the reference to Petitioner's confession, are fact-based and, for the most part, were pub-

lished in October 1978, five months before the trial.

35. The court's conclusion is not altered by consideration of the ten additional articles published between December 20, 1978, and February 13, 1979, submitted by Petitioner's present counsel. These articles are consistent in tone and content with the initial twenty-four. Furthermore, it remains true that the majority of articles was published in October 1978, that no articles were published within the thirty days preceding Petitioner's trial, and that only two articles were published within sixty days of the trial.

defendant. *Patton,* 467 U.S. at 1035, 104 S.Ct. at 2891.

The trial court initially asked the entire panel if they had read anything about the case. RT Vol. I 119:15–18. The twelve venirepersons who responded affirmatively were then questioned in greater detail. RT Vol. I 119:19–125:25. In all but three instances, the court, following the dismissal of a venireperson for cause or upon the exercise of a peremptory challenge, inquired of each replacement venireperson whether he or she had read anything about the case. RT Vol. I 169:26–170:5; 193:24–26; 249:26–250:1; 251:28–252:5; 259:2–260:4; 263:24–26; 265:22–24; 272:18–20; 275:12–14; RT Vol. II 280:10–281:26; 288:11–25; 296:3–15; 300:6–9; 303:26–28; 307:17–308:1; 310:21–311:4; 318:18–319:26; 323:3–8; 334:19–22; 334:19–22; 341:11–18; 369:17–27; 374:18–23; 382:12–18; 389:23–390:6; 393:2–5; 395:22–24; 397:26–28; 400:4–6; 403:1–16; 405:22–24; 409:17–28; 411:2–15; 412:23–423:7; 416:28–417:17. In the three instances in which the court did not inquire about pretrial publicity; RT Vol. I 237:11–248:11; RT Vol. II 376:7–381:25; 384:5–388:7, two of the prospective jurors were immediately dismissed for cause, RT Vol. II 381:20–25; 388:5–6, and the remaining venireperson was peremptorily challenged. RT Vol. II 295:17–20.

With regard to the court's questioning of the twelve venirepersons who became petit jurors, nine swore that they had read or heard nothing about the case, RT Vol. I 193:24–26; 233:15–23; 265:22–24; 272:18–20; RT Vol. II 334:19–222; 341:11–18; 374:18–23; 400:4–6; 405:22–24, while three swore that they had read one or more articles in the local newspaper. RT Vol. II 310:18–20; 369:10–13; 389:16–22. Of those three, two read only the initial account of the incident, RT Vol. II 310:23–24; 369:20, while the third had read something about it "quite some time ago." RT Vol. II 389:26. Two could not recall specifics about what they had read[36], RT Vol. II 369:25–27; 390:4–6; and all three swore that they had neither formed nor expressed an opinion about Petitioner's

guilt or innocence. RT Vol. II 310:25–28; 369:21–24; 389:28–390:3.

The trial court's voir dire demonstrates that actual prejudice did not exist, and that Petitioner's rights to due process and a fair and impartial jury were adequately protected. This conclusion is unaffected by either the trial court's failure to conduct individualized voir dire, *Reiger v. Christensen,* 789 F.2d 1425, 1434 (9th Cir.1986) ("[t]he Constitution does not require an individual voir dire of all jurors exposed to potentially prejudicial publicity"), or its failure to inquire as to the content of the pretrial publicity to which some of the venirepersons had been exposed. *Mu'min v. Virginia,* —— U.S. ——, ——––––, 111 S.Ct. 1899, 114 L.Ed.2d 493, 509–10 (1991) (due process does not require inquiry into the content of pretrial publicity).

### b. The Trial Court's Reliance on Juror Assurances of Impartiality

Petitioner argues that the trial court erred in relying on the jurors' professions of impartiality. This argument is also meritless.

 "The Supreme Court has indicated that a key factor in gauging the reliability of juror assurance of impartiality is the percentage of veniremen who 'will admit to a disqualifying prejudice.'" *Harris,* 885 F.2d at 1364 (quoting *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037). The higher the percentage of venirepersons who admit to a preconceived opinion, the greater the concern over the reliability of the professions of impartiality from the remaining potential jurors in the venire. *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037. In *Murphy,* the court determined that the professed impartiality of potential jurors could be relied upon despite the fact that approximately 26% of the venire was dismissed because they had formed an opinion as to the defendant's guilt. *Id.* See also *Jeffries,* 974 F.2d at 1188 (8% partial); *Harris,* 885 F.2d at 1363 (18% partial). *Cf. Irvin,* 366 U.S. at 727, 81 S.Ct. at 1645 (90% partial). In Petitioner's case the court excused five members of the venire for cause, but none because the venireperson held preconceived notions of Petitioner's guilt.[37] Conse-

---

36. The third was not asked this question.

37. Of forty-nine venirepersons questioned, including the twelve jurors, three alternates, twen-

quently, the trial court justifiably relied on the jurors' sworn assurances regarding their impartiality. RT Vol. I 193:20–23; 233:20–23; 265:18–21; 272:11–14; RT Vol. II 310:18–20; 334:15–18; 341:7–10; 369:10–13; 374:14–17; 389:16–22; 399:28–400:3; 405:18–21.

### 3. Incomplete Record

A transcript of the February 5, 1979, proceeding at which the trial court heard and denied Petitioner's initial motion for a change of venue does not exist. Petitioner complains that the resulting incomplete record constitutes a violation of due process.

■■■ To determine whether an incomplete record constitutes a violation of due process, the court must consider Petitioner's need for the missing transcript. *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir.1989). Two criteria are relevant in determining need: the value of the transcript to Petitioner in connection with the relief sought, and the availability of alternative devices that would fulfill the same function as a transcript. *Id.* (citing *Britt v. North Carolina*, 404 U.S. 226, 227 & n. 2, 92 S.Ct. 431, 433 & n. 2, 30 L.Ed.2d 400 (1971)).

■■■ Consideration of these criteria within the context of this case causes the court to conclude that Petitioner's due process rights have not been violated by reason of the missing transcript. The record contains a full and complete transcript of Petitioner's renewed motion for a change of venue. CT Vol. II 346:5–368:2. The transcript of this second hearing operates sufficiently well as an "alternative device" to the initial hearing on this matter. Thus, there is a basis upon which this court may review the trial court's decision and determine whether Petitioner was entitled to the relief sought. Consequently, this argument fails.

For the foregoing reasons, the relief requested as to Claim F is denied.

### G. Claim G

In a claim closely related to that addressed immediately above, Petitioner alleges that his trial counsel violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by failing to research the law or facts supporting a motion to change venue, to challenge the prosecution's representation of the amount of publicity that existed, to seek pretrial writ review of the trial court's denial of the motion to change venue, to request individualized voir dire, and to conduct adequate voir dire.

Petitioner and Respondent disagree as to the appropriate standard applicable to this claim. Petitioner's contention that he need only demonstrate that, but for the alleged error, the outcome of the motion would have been different is plainly incorrect. As Respondent asserts, the standard set forth in *Strickland* is whether, but for the error, "the factfinder would have had a reasonable doubt respecting guilt ... [or] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* 466 U.S. at 695, 104 S.Ct. at 2069.

1. **Failure to Research the Facts and Law and Challenge the Prosecution's Representation of Publicity; Failure to Request Individualized Voir Dire; Failure to Conduct Adequate Voir Dire**

■■■ As determined *supra* § III(F)(1) and (2), Petitioner's rights to due process and a fair and impartial jury were adequately protected by the trial court's voir dire. A *fortiori*, Petitioner was not prejudiced by his trial counsel's voir dire or his failure to request individualized voir dire.

Similarly, Petitioner was not prejudiced by his trial counsel's alleged failure to research the law or facts supporting the motion to change venue, or to challenge the prosecutor's representation as to the amount of publicity that existed. As discussed *supra* § III(F)(1), the court has considered the publicity submitted by Petitioner's current counsel as well as that submitted at the time of trial. Because the motion was properly denied, Petitioner has suffered no prejudice as a result of his trial counsel's alleged fail-

---

ty-nine venirepersons peremptorily challenged, and five venirepersons excused for cause, twenty-four had read no publicity regarding Petitioner,

twenty-two had read some publicity and, as discussed *supra* § III(F)(2)(a), three were not specifically questioned about publicity.

ure to research. Accordingly, this argument fails.

## 2. Failure to Seek Pretrial Writ Review

 Under California law, criminal defense counsel may, before trial, petition the court of appeal for a writ of mandamus if a motion to change venue is denied. *Maine v. Superior Court,* 68 Cal.2d 375, 379, 66 Cal. Rptr. 724, 438 P.2d 372 (1968). Thus, petitioning the court of appeal for a writ of mandamus is an option under state law, but it is not a federal constitutional requirement. Accordingly, trial counsel's failure to exercise an option under state law is not an error rising, or sinking, to constitutional proportions.

Furthermore, assuming, *arguendo,* that counsel erred by neglecting to seek pretrial writ review, Petitioner has failed to demonstrate a reasonable probability that, but for said error, the motion would have been granted, much less that the outcome of the trial or the penalty imposed would have been different. Consequently, he has not established prejudice resulting from counsel's decision to not seek interlocutory review.

Accordingly, relief for claim G is denied.

## H. Claim H

Petitioner alleges that his trial counsel violated his Fifth, Sixth, Eighth, and Fourteenth Amendments right by stipulating that the court should not give the standard accomplice credibility instruction in conjunction with Tyson's testimony, and by failing to request a modified accomplice credibility instruction.

The CALJIC 3.18 standard accomplice instruction submitted by the prosecution stated:

[i]t is the law that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it

with care and caution and in the light of all the evidence in the case.

CT Vol. II 322. The modified charge that Petitioner argues should have been requested would have instructed the jury that those portions of Tyson's testimony tending to incriminate Petitioner should be viewed with distrust.

### 1. Ineffective Assistance of Counsel

 In accordance with the stipulation between counsel, the trial court did not specifically instruct the jury to view Tyson's testimony with distrust. Petitioner argues that this "omission prejudiced [him] because it permitted the jury to consider unreliable and highly prejudicial evidence, including accomplice Tyson's testimony regarding Petitioner's purported description of his conduct at the time of victim Meza's death." Pet. 81:10–14. Petitioner contends that, but for this error, it is reasonably probable the jury would have reached different verdicts. The court disagrees.

Petitioner testified at trial and expressly admitted to killing three people. *See supra* note 25. Furthermore, he made a taped confession which the prosecution played for the jury. *See supra* note 26. Thus, Petitioner personally supplied the jury with overwhelming evidence that he killed the three victims; Tyson's testimony was cumulative in that regard. Therefore, Petitioner was not prejudiced either as a result of counsel's stipulation to withdraw the instruction which would have informed the jury that Tyson's testimony should be regarded with distrust, or his failure to request a modified instruction. Either instruction would have affected the jury's consideration of Tyson's testimony, but neither would have affected its consideration of Petitioner's testimony and confession.[38]

Furthermore, Petitioner has failed to demonstrate that omission of the instruction had any impact on the sentencing phase of the

---

**38.** The issue upon which Tyson's testimony could have impacted was the extent of Petitioner's legal responsibility for his acts. Petitioner's counsel attempted to set forth a diminished capacity defense. Consequently, Tyson's testimony, to the extent that it concerned Petitioner's drug and

alcohol use, was potentially favorable to Petitioner. It is therefore conceivable that counsel wanted the jury to give credence to Tyson's testimony. However, the standard accomplice instruction would have prevented this, and a modified instruction would have had no beneficial effect.

trial. "When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

The court questions the impact and relevance of an omitted guilt phase instruction on the jury's sentencing determination. However, assuming, *arguendo,* that the omission reverberated into the jury's sentencing phase deliberations, the court, having read the entire transcript and considered the aggravating and mitigating circumstances as presented during the penalty phase, concludes that there is no reasonable probability that, but for the omission, the jury would have reached a verdict other than death. The record clearly supports the jury's determination that the aggravating factors outweigh any factors in mitigation.

### 2. Due Process

■ Petitioner argues, in passing, that the trial court violated his right to due process by failing to give, *sua sponte,* an accomplice credibility instruction. In *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977), the Supreme Court determined that the question in a collateral proceeding in which process is challenged by reason of an omitted jury instruction is whether the omission so infected the entire trial that the trial cannot be relied on as having produced a just result. *Id.* at 154, 97 S.Ct. at 1736. A petitioner who makes such a due process challenge carries an "especially heavy" burden. *Id.* at 155, 97 S.Ct. at 1737.

*Henderson* makes clear that Petitioner's unsupported allegation of a due process violation is insufficient. He has presented no authority for his contention that the trial

court had a duty to give an accomplice credibility instruction on its own motion in order to comport with due process requirements. To the contrary, the Ninth Circuit has determined that a judge's failure to *sua sponte* instruct the jury on accomplice credibility does not constitute plain error under federal law. *United States v. Bosch,* 914 F.2d 1239, 1247 (1990); *United States v. Busby,* 484 F.2d 994, 997 (9th Cir.1973), *cert. denied,* 415 U.S. 980, 94 S.Ct. 1570, 39 L.Ed.2d 877 (1974).[39] Furthermore, Petitioner has not attempted to demonstrate that omission of the accomplice instruction so infected his trial as to cast doubt on the justness of the result. Accordingly, the court finds that no due process violation occurred.

Relief as to Claim H is therefore denied.

### I. Claim I

Petitioner alleges that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by appointing psychiatrists for the dual purpose of determining his sanity at the time of the offenses and his competency to stand trial. As discussed *supra* § III(B)(6), Petitioner's competency was never seriously in issue. Moreover, Petitioner points to no statements regarding competency that were introduced as evidence despite being excludable. Thus, any error of the trial court by reason of this "dual" appointment was harmless. Accordingly, relief as to this claim is denied.

### J. Claim J

Petitioner challenges the jury's verdict of sanity, alleging that the trial court instructed the jury "on an improper and inapplicable definition of legal insanity." Pet. 86:7–8. Petitioner contends that the trial court's error resulted in the violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

---

**39.** Although not determinative, California law achieves the same result. While a court must give an accomplice instruction on its own motion if the accomplice is called by the prosecution and gives testimony favorable only to the prosecution, *People v. Terry,* 2 Cal.3d 362, 398–99, 85 Cal. Rptr. 409, 466 P.2d 961 (1970), *cert. dismissed,* 406 U.S. 912, 92 S.Ct. 1619, 32 L.Ed.2d 112 (1972), a court need not give an instruction if the

accomplice gives testimony favorable to the prosecution and the defense. In the latter case a modified instruction may be given, *People v. Flanders,* 89 Cal.App.3d 634, 639–40, 152 Cal. Rptr. 696 (1979), or, at the request of the defendant, omitted. *People v. Miller,* 185 Cal.App.2d 59, 83–84, 8 Cal.Rptr. 91 (1960), *cert. denied,* 365 U.S. 568, 81 S.Ct. 755, 5 L.Ed.2d 807 (1961).

The trial court twice instructed the jury on the legal definition of insanity. First, the judge correctly defined insanity according to the American Law Institute (ALI) definition adopted in *People v. Drew*, 22 Cal.3d. 333, 149 Cal.Rptr. 275, 583 P.2d 1318 (1978) [40]:

[a] person is legally insane if, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

If you find that the defendant had substantial capacity to appreciate the criminality of his conduct and had substantial capacity to conform his conduct to the requirements of law, you will find that he was legally sane.

However, if you find that as a result of mental disease or mental defect the defendant lacked substantial capacity to appreciate the criminality of his conduct or that he lacked substantial capacity to conform his conduct to the requirements of law, you will find that he was legally insane.

The word criminality as used in this in[s]truction means an act or conduct which constitutes a crime.

RT Vol. VII 1551:21–1552:7. However, the judge subsequently gave a *M'Naghten* instruction: "[a] person whose brain has become diseased or damaged by the use of intoxicating liquor, drugs or narcotics so as to render him incapable of knowing or understanding the nature and quality of his act, or make him incapable of knowing or understanding that his act was wrong, is legally insane." *Id.* at 1552:14–18. In concluding the sanity phase instructions, the judge reiterated a paraphrased *Drew*/ALI definition of insanity, stating that "[u]ncontrollable or irresistible impulse itself is not legal insanity unless as a result of mental disease or mental defect a person lacked substantial capacity to appreciate the criminality of conduct or to conform his conduct to the requirements of law."[41] *Id.* at 1552:28–1553:4.

The California Supreme Court determined that the trial court erred by including the *M'Naghten* definition of insanity, but found such error harmless. *Williams*, 44 Cal.3d at 931, 245 Cal.Rptr. 336, 751 P.2d 395. This court agrees.

A prisoner is entitled to federal habeas relief only if he is held in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. 2254(a). A mere error of state law is not a denial of due process or fundamental fairness. *Engle v. Isaac*, 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, 1568 n. 21, 71 L.Ed.2d 783 (1982) (quoting *Gryger v. Burke*, 334 U.S. 728, 731, 68 S.Ct. 1256, 1257, 92 L.Ed. 1683 (1948)). Consequently, that a jury instruction may be incorrect under state law is not a basis for relief. *Estelle v. McGuire*, — U.S. —, ——, 112 S.Ct. 475, 481, 116 L.Ed.2d 385, 398 (1991); *Engle*, 456 U.S. at 119, 102 S.Ct. at 1567. The question for a federal habeas court is whether the instruction so infected the entire trial that the resulting conviction violates due process. *McGuire*, — U.S. at ——, 112 S.Ct. at 482, 116 L.Ed.2d at 399 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc).

To determine whether the *M'Naghten* instruction so infected the trial as to violate due process, the court must view the instruction in the context of the overall charge to the jury. *McGuire*, — U.S. at ——, 112 S.Ct. at 482, 116 L.Ed.2d at 399; *Cupp*, 414 U.S. at 146–47, 94 S.Ct. at 400–01; *McSherry v. Block*, 880 F.2d 1049, 1059 (9th Cir.1989), *cert. denied*, — U.S. —, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991). The question is " 'whether there is a reasonable likelihood that the jury applied the challenged instruction in a way' that violates the Constitution." *McGuire*, — U.S. at ——, 112 S.Ct. at 482, 116 L.Ed.2d at 399 (quoting *Boyde v. Califor-*

**40.** California has since reinstated the *M'Naghten* definition of insanity. Cal. Penal Code § 25(b); *People v. Skinner* 39 Cal.3d 765, 217 Cal.Rptr. 685, 704 P.2d 752 (1985).

**41.** The court's instructions corroborated and reemphasized the correct *Drew*/ALI definition of insanity previously given by the prosecutor. RT Vol. VII 1545:4–8. *See also id.* at 1541:13–16; 1542:20–24.

*nia,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)).

■ The court finds error with the trial judge's inclusion of the *M'Naghten* language in his charge to the jury. Although there is no constitutional right to a particular definition of insanity, once a state has established, within its rules of criminal procedure, that one definition of insanity must be used to the exclusion of another, due process protects a defendant's right to have the state follow its procedure and utilize the sanctioned definition. *Hicks v. Oklahoma,* 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980); *Ballard v. Estelle,* 937 F.2d 453, 456 (9th Cir.1991); *Aiken v. Blodgett,* 921 F.2d 214, 217 (9th Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 125, 116 L.Ed.2d 93 (1991). At the time of Petitioner's trial it was clearly established that a defendant pleading not guilty by reason of insanity was entitled to a determination of sanity under the ALI/*Drew* definition. However, the trial court's instruction plainly included the more restrictive, prohibited *M'Naghten* language, and thereby exacerbated Petitioner's burden of proving insanity. Nevertheless, the error was harmless.

■ An error is harmless where it appears beyond a reasonable doubt that it did not contribute to the verdict obtained. *Yates v. Evatt,* — U.S. —, — – —, 111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432 (1991) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). "To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as re-

vealed in the record." *Yates,* — U.S. at —, 111 S.Ct. at 1893, 114 L.Ed.2d at 449. To determine whether an error contributed to the verdict, the court inquires as to the evidence the jury considered in reaching the verdict, and weighs the probative force of the evidence against the force of the error.

■ The jury considered evidence presented in both the guilt and sanity phases to determine Petitioner's sanity.[42] Petitioner presented no direct evidence, and little circumstantial evidence, of insanity during the guilt phase of his trial.[43] He presented no evidence of insanity during the sanity phase of the trial.[44]

The probative force of the evidence presented regarding sanity, that is, the virtual absence of evidence demonstrating insanity, far outweighs the force of the instructional error, and renders the conflict between the ALI/*Drew* definition of insanity and the *M'Naghten* language inconsequential. In other words, the evidence did not support a finding of insanity under either definition given by the trial court. Consequently, the instructional error was simply "unimportant" within the meaning of *Yates.* Accordingly, as it is beyond a reasonable doubt that the error was harmless, relief as to this claim is denied.

## K. Claim K

Invoking the Fifth, Sixth, Eighth, and Fourteenth Amendments, Petitioner argues that his rights to due process, a reliable determination of guilt of the special circumstances, and a constitutional death verdict were violated because the felony offenses

---

**42.** California law requires a jury to consider guilt and sanity phase evidence in determining a defendant's sanity. Cal.Penal Code § 190.4(d). Although the trial judge did not expressly instruct the jury on this point, it was clearly implied in his sanity phase instructions. For example, the court instructed the jury that it could "consider evidence of [Petitioner's] mental condition before and after the time of the commission of the crime, such evidence is to be considered for the purpose of throwing light upon his mental condition as it was when the crimes were committed." RT Vol. VII 1551:12–16. The fact that both counsel mentioned guilt phase evidence in their sanity phase closing arguments also demonstrates the clear implication that the jury was to

consider guilt phase evidence. RT Vol. VII 1538:24–26; 1540:17–22; 1541:17:28; 1542:28–1544:19.

**43.** Although "the 'essence' of [Petitioner's] insanity defense was his longstanding use of alcohol and drugs," the California Supreme Court found that "this theory was not articulated to the jury." *Williams,* 44 Cal.3d at 932 n. 28, 245 Cal.Rptr. 336, 751 P.2d 395.

**44.** Petitioner's sanity phase evidence included two psychiatric evaluations and an EEG report. *Supra* § III(B)(1)(b).

underlying the rape, robbery, and kidnapping special circumstances were not separately charged and proven. Specifically, Petitioner argues that the prosecutor's failure to separately charge the special circumstances violated Cal. Penal Code § 190.4(a) which provided that "[w]henever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime."

Without expressly assigning error,[45] the California Supreme Court determined that Petitioner suffered no prejudice resulting from the prosecution's failure to separately charge the special circumstances. *Williams*, 44 Cal.3d at 925–27, 245 Cal.Rptr. 336, 751 P.2d 395.

As previously noted, a state prisoner is entitled to federal habeas relief only if he is held in custody in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. 2254(a). A mere error of state law does not constitute a denial of due process. *Engle v. Isaac*, 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, 1568 n. 21, 71 L.Ed.2d 783 (1982) (quoting *Gryger v. Burke*, 334 U.S. 728, 731, 68 S.Ct. 1256, 1257, 92 L.Ed. 1683 (1948)). *See also Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986). In fact, "the presence or absence of a state law violation is largely beside the point." *Jammal v. Van De Kamp*, 926 F.2d 918, 919–20 (9th Cir.1991); *Braley v. Gladden*, 403 F.2d 858, 860 (9th Cir.1968). "The issue is whether the state proceedings satisfied due process...." *Jammal*, 926 F.2d at 919–20.

 Due process protects Petitioner's Sixth Amendment right to be informed of the nature and cause of the charges against him, his fundamental right to have a jury determination that the charges levied against him are true beyond a reasonable doubt, *In re*

*Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), his Fifth Amendment right against double jeopardy, and his Eighth Amendment right to the constitutional imposition of the death penalty. The record clearly demonstrates that none of these rights were violated by the state's failure to separately charge the special circumstances.

 First, Petitioner had constitutionally adequate notice of the charges against him because the prosecution alleged rape, kidnapping, and robbery as special circumstances in the criminal complaint. CT Vol. I 1–4; *Sheppard v. Rees*, 909 F.2d 1234, 1236 n. 2 (9th Cir.1989).

Second, the court instructed the jury on the definition and elements of the special circumstance offenses, RT Vol. VII 1418:27–1419:3; 1419:4–15; 1419:22–1420:11; 1431:19–1432:12; 1432:19–1433:13; and 1433:21–1434:7, and on the prosecutor's burden of proving each special circumstance offense beyond a reasonable doubt for it to be found true. *Id.* at 1411:3–16; 1418:24–26; 1419:16–21; 1420:12–16; 1429:2–10; 1432:13–18; and 1433:14–20. With the exception of the rape circumstance, the jury determined that the prosecutor had proven the special circumstance offenses beyond a reasonable doubt. CT Vol. II 412; 414; 416.

Third, Petitioner was substantively prosecuted for rape, kidnapping and robbery. Consequently, the Double Jeopardy Clause protects him against subsequent prosecution of these offenses. *Grady v. Corbin*, 495 U.S. 508, 510, 110 S.Ct. 2084, 2087, 109 L.Ed.2d 548 (1990) ("the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in the prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted"). Petitioner has made no showing that this right has been violated.

---

45. Case law in existence at the time the California Supreme Court decided Petitioner's appeal/petition provided that failure to separately charge underlying offenses was **harmless error.** *People v. Robertson*, 33 Cal.3d 21, 47, 188 Cal. Rptr. 77, 655 P.2d 279 (1982); *People v. Velasquez*, 26 Cal.3d 425, 434 n. 6, 162 Cal.Rptr. 306, 606 P.2d 341 (1980), *vacated*, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1132 (1980), *reinstated*, 28 Cal.3d 461, 171 Cal.Rptr. 507, 622 P.2d 952 (1981). Subsequently, in *People v. Morris*, 46 Cal.3d 1, 14, 249 Cal.Rptr. 119, 756 P.2d 843 (1988), the California Supreme Court determined that failure to separately plead special circumstances is not necessarily error.

Last, the alleged state law error did not contaminate the process by which Petitioner was found death eligible. Consequently, imposition of the death penalty did not violate Petitioner's Eighth Amendment right to the constitutional imposition of the death penalty.

For the foregoing reasons, relief as to this claim is denied.

### L. Claim L

Petitioner alleges that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by failing to instruct the jury on an essential element of the kidnapping special circumstance, namely that before it could find the kidnapping special circumstance true, it must find Petitioner killed Meza to advance an independent felonious purpose. Due to the court's failure to give this instruction, Petitioner alleges the violation of his rights to a fair trial, including a jury determination regarding the kidnapping special circumstance, to be free from double jeopardy, and to the constitutional imposition of the death penalty.

After defining kidnapping, RT Vol. VII 1419:4–21, the trial court gave the following kidnapping special circumstance instructions:

[i]t is further charged that Keith Daniel Williams was personally present and physically aided or committed the acts causing the death of Lourdes Meza and that the murder of Lourdes Meza was willful, deliberate and premeditated and was committed during the commission or attempted commission of kidnapping in violation of Section 207 of the California Penal Code.

. . . .

To find that the special circumstance referred to in these instructions as murder in [the] commission of a kidnapping[ ] is true, each of the following facts must be proved.

One, that the murder was willful, deliberate and premeditated, and two, that defendant was personally present during the commission of the act or acts causing death, and three, that defendant, with intent to cause death, physically aided or committed the act or acts causing death,

and four, that the murder was committed during the commission or attempted commission of a kidnapping.

Kidnapping is unlawfully compelling another person against his will and without his consent and because of a reasonable apprehension of harm to move for a substantial distance where such movement is not merely incidental to the commission of the crime of robbery or rape and where such movement substantially increases the risk of harm to such person over and above that necessarily inherent in the commission of the crime or crimes of robbery or rape.

It is a defense to a charge of kidnapping that the defendant entertained a reasonable good faith belief that the person alleged to have been kidnapped voluntarily consented to accompany the defendant and to the movement involved in the alleged kidnapping.

If from all the evidence you have a reasonable doubt whether the defendant reasonably and in good faith believed that the person alleged to have been kidnapped voluntarily consented to accompany the defendant and to the said movement, you must give the defendant the benefit of that doubt and find that the special circumstance kidnapping charge in the tenth paragraph is not true.

RT Vol. VII 1428:23–1429:1; 1432:19–1433:20.

Petitioner contends the trial court should have instructed the jury that "it must find beyond a reasonable doubt that the **kidnapping** must advance an independent felonious purpose other than the killing before it could find the special circumstance true." Pet. 91:3–6 (emphasis added). This is a misstatement of California law.

As the California Supreme Court noted in considering Petitioner's appeal/petition, "the special circumstance of killing during the commission of one of the felonies enumerated in section 190.2, subdivision (a)(17), exist[s] only if the **killing** was to advance the independent felonious purpose" of any of the enumerated felonies. *Williams,* 44 Cal.3d at 928, 245 Cal.Rptr. 336, 751 P.2d 395 (quoting *People v. Green,* 27 Cal.3d 1, 61, 164 Cal.

Rptr. 1, 609 P.2d 468 (1980)) (emphasis added). In other words, the kidnapping special circumstance could not be true if the kidnapping was merely incidental to the killing. However, if the killing advanced the independent felonious purpose of kidnapping, the kidnapping special circumstance could be true. *Id.* 44 Cal.3d at 927, 245 Cal.Rptr. 336, 751 P.2d 395. The California Supreme Court assumed state law required a *Green* instruction, but found its omission harmless because "overwhelming" evidence showed that the killing advanced the independent felonious purpose of kidnapping. *Id.* at 928–29, 245 Cal.Rptr. 336, 751 P.2d 395.

As discussed above, an incorrect jury instruction is not a basis for federal habeas relief. *Estelle v. McGuire,* —— U.S. ——, ——, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, 398 (1991); *Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982). The only question for a federal habeas court is whether omission of the instruction so infected the entire trial that the resulting conviction violates due process. *McGuire,* —— U.S. at ——, 112 S.Ct. at 482, 116 L.Ed.2d at 399 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)); *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *Carriger v. Lewis,* 971 F.2d 329, 334 (9th Cir. 1992) (en banc).

 Under California law, an element of the kidnapping special circumstance is that the killing must advance the felonious purpose of kidnapping. The trial court failed to instruct the jury in this regard. "Failure to properly instruct the jury regarding an element of the charged crime is a constitutional error that deprives the defendant of due process unless . . . the error can be treated as harmless." *Hennessy v. Goldsmith,* 929 F.2d 511, 514 (9th Cir.1991) (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Thus, the trial court erred in omitting this element from the kidnapping special circumstance instructions. However, that error was harmless.

An error is harmless where it appears beyond a reasonable doubt that it did not contribute to the verdict obtained. *Yates v. Evatt,* —— U.S. ——, —— – ——, 111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432 (1991) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). An error did not contribute to the verdict if it was unimportant in relation to everything else the jury considered on the issue in question. *Yates,* —— U.S. at ——, 111 S.Ct. at 1893, 114 L.Ed.2d at 449. To determine whether an error contributed to the verdict, the court must inquire as to what facts the jury necessarily found under the instructions given, and whether it is beyond a reasonable doubt that, in finding those facts, the jury must also have found the element on which the instructions were deficient. *Hart v. Stagner,* 935 F.2d 1007, 1011 (9th Cir.1991). *See also Martinez v. Borg,* 937 F.2d 422, 424–25 (9th Cir.1991). *Cf. United States v. Valdez,* 594 F.2d 725, 729 (9th Cir.1979).

The instructions clearly required the jury to determine whether kidnapping was proven. To determine whether a kidnapping occurred, the jury necessarily considered Petitioner's actions from the time of Meza's asportation to the time of her death. The evidence demonstrates that Petitioner could have killed Meza at the farmhouse but, instead, transported her a substantial distance against her will, that Petitioner intended to have, and had, sexual intercourse with Meza during said asportation, and that Petitioner killed Meza.

The jury considered this evidence and determined that a kidnapping occurred. This conclusion necessarily includes the common sense recognition that Petitioner did not simply intend to kill Meza, because this plan would most easily and simply have been accomplished at the farmhouse. Instead, the evidence shows, the jury necessarily determined, and the California Supreme Court found, that after robbing Meza, Petitioner's primary felonious purpose was to kidnap her, his secondary felonious **intent** was to rape her,[46] and his third felonious purpose was to kill her. *See, e.g., Williams,* 44 Cal.3d at 928–29, 245 Cal.Rptr. 336, 751 P.2d 395. The

---

**46.** The court notes that the jury's finding of not true on the rape special circumstance does not conflict with a determination that Petitioner harbored the **intent** to commit rape.

killing advanced the prior felonious purposes by silencing the victim.

The absence of an instruction that Petitioner must have killed Meza to advance the kidnapping neither prevented the jury from fully considering whether the kidnapping was merely incidental to the killing, nor precluded its determination that the kidnapping was an independent felonious purpose advanced by the killing.[47] Consequently, the court finds that the jury made a constitutionally adequate determination that the kidnapping special circumstance was true. The imposition of the death sentence on the basis of the kidnapping special circumstance is, therefore, constitutional. No double jeopardy concerns exist. *Supra* note 47. Accordingly, relief as to Claim L is denied.[48]

## M. Claim M

Petitioner asserts that the trial court's allegedly erroneous penalty phase instructions violated his Eighth and Fourteenth Amendment rights to individualized consideration of the appropriate penalty and, consequently, a reliable penalty determination. Specifically, Petitioner challenges the trial court's reading of CALJIC 8.88.1 on the ground that it "injected irrelevant factors into the case, thereby arbitrarily expanding the list of potential aggravating factors and permitting the jury to consider [irrelevant] mitigating circumstances in aggravation." Pet. 92:10–13.

Pursuant to CALJIC 8.88.1, the court instructed,

> In determining which penalty is to be imposed on defendant you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors if applicable.

A. The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

B. The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

C. Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

D. Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

E. Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

F. Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

G. Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication.

H. The age of the defendant at the time of the crime.

---

**47.** Petitioner argues that, given the jury's finding that he did not murder Meza during the commission or attempted commission of a rape, it could not have found that the killing advanced the independent felonious purpose of the kidnapping which, Petitioner argues, was the rape. Petitioner's argument, inasmuch as it is based on his misstatement of California law as noted *supra*, is without merit.

The California Supreme Court determined that Petitioner kidnapped Meza with the intent to commit the second, additional felony of rape. This court does not disagree. Petitioner's **intent** to sexually assault Meza gives meaning to the kidnapping. However, the question is whether the jury, in finding the kidnapping special circumstance true, determined that Petitioner killed Meza to advance his independent felonious purpose of kidnapping. Discussion of the alleged rape simply confuses the issue.

**48.** The court notes that, on the facts of this case, any error regarding the kidnapping special circumstance instruction, harmless or otherwise, is without practical consequence; Petitioner's death-eligibility vis à vis Meza's murder does not rise and fall with the validity of the kidnapping special circumstance. Two factors independent of the kidnapping special circumstance, the multiple murder special circumstance, Cal.Penal Code § 190.2(c)(5), and the finding of willful, deliberate, and premeditated murder committed during the commission or attempted commission of a robbery, Cal. Penal Code § 190.2(c)(3)(i), support Petitioner's death-eligibility in connection with Meza's murder.

I. Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

J. Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

You must not consider as to aggravation any evidence of criminal activity by defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence.

RT Vol. VII 1613:3–1614:11.

Petitioner contends the trial court's alleged error in reading this instruction was exacerbated by the prosecutor's subsequent argument that the absence of certain mitigating factors should be considered as aggravating factors by the jury in its weighing process.

The California Supreme Court found no state law error. *Williams,* 44 Cal.3d at 959–60, 245 Cal.Rptr. 336, 751 P.2d 395. The only question before this court is whether the state proceeding satisfied due process. *Jammal v. Van De Kamp,* 926 F.2d 918, 919–920 (9th Cir.1991).

In *Harris v. Pulley,* 885 F.2d 1354, 1379 (1988), *cert. denied,* 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990), the Ninth Circuit assumed the inclusion of all ten § 190.3 factors in the penalty phase jury instructions. *See also Pulley v. Harris,* 465 U.S. 37, 53, 104 S.Ct. 871, 881, 79 L.Ed.2d 29 (1984); *Bonin v. Vasquez,* 794 F.Supp. 957, 981 (C.D.Cal.1992). *Cf. Campbell v. Kincheloe,* 829 F.2d 1453, 1457–60 (9th Cir.1987), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). Moreover, the Supreme Court has noted the constitutional importance of guiding a jury regarding the factors which the state deems relevant to making a sentencing decision. *Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976). Therefore, it cannot be said that the trial court's verbatim § 190.3 instructions violated due process. Accordingly, this claim is denied.[49]

---

49. Petitioner's challenge to the prosecutor's penalty phase argument is discussed *infra*

### N. Claim N

Petitioner asserts the violation of his rights under the Fifth, Eighth, and Fourteenth Amendments resulting from the jury's penalty phase consideration of the six multiple murder special circumstances as separate aggravating factors. Petitioner argues that the jury's consideration of these improperly duplicative special circumstances violated his rights to due process and a reliable penalty determination.

The state charged Petitioner with six multiple murder special circumstances, and the jury found all six circumstances to be true. Pursuant to Cal.Penal Code § 190.3, the trial court instructed the jury at the penalty phase that it should:

consider, take into account and be guided by the following factors if applicable.

A. The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

B. The presence or absence of criminal activity by the defendant which involved ... force or violence ...

RT Vol. VI 1613:5–14.

The Ninth Circuit addressed the issue of redundant special circumstance charges in *Harris v. Pulley,* 692 F.2d 1189, 1203 (1982), *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Harris,* the petitioner was charged with murdering two people and, *inter alia,* two multiple murder special circumstances. In that case, the petitioner challenged the redundant special circumstance charges on the same grounds presented here, that is, that the court's instructions, coupled with the "artificial increase in aggravating factors[,] impermissibly inflated the risk that the jury would arbitrarily impose a sentence of death." Pet. 96:16–18. The Ninth Circuit, however, found no constitutional violation:

the jury could not have been misled in this case by the duplicative charging of special circumstances. It was clear throughout

---

§ III(P)(2).

the trial that two murders, not four, were committed, and that both murders arose out of one incident. It is highly unlikely that the jury simply counted up the special circumstances charged and based its verdict on such calculation. We cannot reverse on the basis of speculation of that nature.

*Id.*

Similarly, it was clear throughout Petitioner's trial that three murders, not twelve, were committed, and that all three murders arose from the same incident. As in *Harris*, it is highly unlikely that the jury reached its penalty phase verdict simply by counting the multiple murder special circumstances. Accordingly, as no constitutional violation occurred, relief as to this claim is denied. *See Bonin v. Vasquez*, 794 F.Supp. 957, 981 (C.D.Cal.1992).

## O. Claim O

Petitioner argues that the trial court's allegedly erroneous penalty phase instructions violated his Fifth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, and a reliable penalty determination.

This claim arises from the prosecutor's incorrect penalty phase argument that the jury **must** impose the death penalty if it found the aggravating factors to outweigh the mitigating factors. Petitioner challenges the trial court's subsequent correction of the prosecutor's error:

> if during the course of the argument you thought you heard any comment about the law as being that it was that you shall impose a sentence of death if you conclude that the aggravating circumstances outweigh the mitigating circumstances, or you shall impose mitigating—excuse me, life imprisonment without possibility of parole if you feel that mitigating circumstances outweigh the aggravating circumstances, I

tell you that's not the law that applies to the case.

> You may use those. As the way in which you go about this. But the way in which you go about it is up to you. And the law does not say you shall do one or the other.

RT Vol. VII 1614:12–22.

The California Supreme Court determined that the trial court committed no error by giving the challenged instruction. *Williams*, 44 Cal.3d at 955, 245 Cal.Rptr. 336, 751 P.2d 395. This court's review is limited to determining whether the state proceeding satisfied due process requirements. *Jammal v. Van De Kamp*, 926 F.2d 918, 919–920 (9th Cir.1991).

■ Petitioner's threefold challenge to this instruction fails to demonstrate a due process violation. First, Petitioner argues that the trial court's instructions improperly permitted the jury to consider irrelevant and impermissible non-statutory aggravating factors in determining the penalty. However, Petitioner points to no such specific factors in the court's instructions. Moreover, a jury's consideration of non-statutory factors that enhance its ability to make an individualized determination of sentence does not necessarily constitute a denial of due process. *Harris v. Pulley*, 885 F.2d 1354, 1379–84 (9th Cir. 1988), *cert. denied*, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990).

■ Second, Petitioner contends that the court's instructions permitted the jury to adopt the prosecutor's incorrect mandatory approach to determining the penalty, thereby precluding or inhibiting an individualized penalty determination.[50] As the California Supreme Court noted, a plain reading of the instruction simply does not support this argument. *Williams*, 44 Cal.3d at 957, 245 Cal.Rptr. 336, 751 P.2d 395. The trial court's charge was in keeping with the mandate of Cal.Penal Code § 190.3,[51] which expressly di-

---

**50.** The court notes the prosecutor reminded the jury that his argument was not evidence, RT Vol. VII 1600:10–13, and that Petitioner's trial counsel also informed the jury that the court's instructions take precedent over counsel's argument. *Id.* at 1601:17–21.

**51.** Section 190.3 provides:

[a]fter having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole.

rects the jury to be guided by the individualizing factors provided by the California legislature, that is, the mitigating and aggravating circumstances contained in § 190.3. Compliance with § 190.3 does not obstruct an individualized determination of penalty or violate due process.

Last, Petitioner argues that the trial court's instruction was so confusing that it failed to provide "clear and precise" guidelines for the jury. The Supreme Court has recognized the constitutional requirement that a sentencing jury's decision-making be guided so as to avoid the capricious or arbitrary imposition of the death penalty. *Gregg v. Georgia,* 428 U.S. 153, 192–95, 96 S.Ct. 2909, 2934–36, 49 L.Ed.2d 859 (1976). Discussing the subject of jury sentencing in a capital case, the *Gregg* Court stated:

> the concerns expressed in *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Id.* 428 U.S. at 195, 96 S.Ct. at 2935.

▮ Thus, while the Constitution requires guiding standards for the sentencing authority in a capital case, there is no requirement that such standards be "clear and precise" as Petitioner argues. Indeed, the Supreme Court expressly anticipated that "such standards are by necessity somewhat general." *Id.* at 193–94, 96 S.Ct. at 2935. Moreover, subsequent to its decision in *Gregg,* the Court expressly upheld the constitutionality of the California death penalty sentencing scheme. *See supra* § III(D)(2). Consequently, the trial court's penalty phase charge, which instructed the jury to consider the evidence and use the § 190.3 factors as guidance, was constitutionally adequate and satisfied the concern expressed in *Gregg* and *Furman,* that is, of ensuring that capital defendants receive individual consideration of the appropriate penalty to protect against the arbitrary or capricious imposition of the death penalty. Accordingly, relief as to Claim O is denied.

### P. Claim P

Petitioner contends that prosecutorial misconduct during the penalty phase violated his Fifth, Sixth, Eighth, and Fourteenth Amendments rights. Specifically, Petitioner asserts that the following comments of the prosecutor rendered the trial fundamentally unfair and violated his right against double jeopardy, namely, that: (1) all ten § 190.3 factors could be considered regardless of whether evidence existed pertaining to the factor; (2) each factor must be considered as either aggravating or mitigating, and that factors with regard to which no evidence was produced were aggravating; (3)(a) Petitioner lacked remorse, and that this was an aggravating factor; and (b) the victims' loss of life should be considered. Both of these statements allegedly pandered to the jury's passions and prejudices; (4) the jury should "add up" the factors to see whether the mitigating "outweigh" the aggravating or vice versa, and that the jury must impose the death penalty if the aggravating factors outweighed the mitigating factors;[52] (5) the jury had promised to impose the death penalty during voir dire; (6) Petitioner "raped" Meza despite the jury's determination that the rape special circumstance was not true; and (7) the prosecutor's statements diminished the jury's sentencing responsibility by not informing it of its discretion, but instead by giving the impression that a death sentence was mandatory if the aggravating factors outweighed the mitigating factors, thus precluding an individualized, non-arbitrary and non-capricious sentencing determination.

---

52. The prosecutor's statement that the jury must impose the death penalty in certain circumstances is discussed *supra* § III(O).

■ Improper prosecutorial remarks do not constitute a *per se* violation of a defendant's rights. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). Such comments are reviewed pursuant to the "narrow" due process standard to determine if they rendered the proceedings fundamentally unfair. *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471; *Jeffries v. Blodgett,* 974 F.2d 1179, 1189 (9th Cir.1992).

■ Because Petitioner's trial counsel did not object to any of the challenged statements, this court reviews for plain error. *Jeffries,* 974 F.2d at 1189. *But cf. United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982) (Court applied cause and prejudice standard in reviewing propriety of jury instructions to which the petitioner failed to object at trial); *but cf.* 456 U.S. at 137, 102 S.Ct. at 1577 (Blackmun, J., concurring) (cause and prejudice standard need not be met where state has declined to enforce its own contemporaneous objection rule). An error is plain only if it is highly prejudicial and affects substantial rights. *United States v. Dischner,* 974 F.2d 1502, 1515 (9th Cir.1992), *petitions for cert. filed,* (U.S. Oct. 26, 1992) (No. 92–6409); (U.S. Dec. 3, 1992) (No. 92–6802). No such error occurred here.

### 1. The § 190.3 Factors

■ As discussed *supra* § III(M), it is proper under California law for the jury to be informed of all § 190.3 statutory factors. *Williams,* 44 Cal.3d at 964, 245 Cal.Rptr. 336, 751 P.2d 395. Given the constitutional importance of providing a jury with guidance as to the factors which the state deems relevant to a sentencing decision, federal law is in accord. *Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976). Thus, the prosecutor's discussion of the § 190.3 factors was consistent with the guidance contemplated under state and federal law and was not error.

### 2. Each Factor is Either Aggravating or Mitigating; Confusion as to the Definition of Aggravating and Mitigating

The prosecutor's statement that "it's a factor, it's either an aggravating or it's a miti-

gating factor," RT Vol. VII 1594:17–18, is the basis of Petitioner's assertion that the jury was improperly directed to consider each factor as either mitigating or aggravating. Petitioner's assertion is a mischaracterization of the prosecutor's argument.

■ As stated directly above, the prosecutor's discussion of the § 190.3 factors was proper. He presented each factor and discussed its relation or inapplicability to the facts, guiding the jury in determining which factors were relevant, arguing that certain factors were aggravating, and downplaying those that might have been mitigating. This argument did not direct the jury to consider the absence of mitigating factors as aggravating. The prosecutor simply set forth his position and invited the jury to interpret the facts and apply the factors as he did. Given the tone and context of the opening within which the challenged statement is located, the court reads said statement as simply arguing that certain factors were **inapplicable mitigating factors,** not, as Petitioner contends, that the absence of a mitigating factor is aggravating. Thus, no error occurred by reason of this comment.

Even assuming, *arguendo,* that error occurred, the prosecutor reminded the jury that his argument was not evidence, *id.* at 1600:11–13, and the court instructed the jury to consider only the **applicable** factors in determining Petitioner's sentence. *Id.* at 1613:5–7. Consequently, any error that may have occurred was harmless as it was vitiated by the prosecutor's reminder and the court's instructions.

### 3. Appeal to Passion and Prejudice

Petitioner asserts that the prosecutor "divert[ed] the jury from deciding the case on the relevant evidence concerning the crime and the Petitioner by inflaming its passions and prejudices." Pet. 105:6–9. Specifically, Petitioner points to the prosecutor's discussion of the victims and Petitioner's lack of remorse.

#### a. Petitioner's Lack of Remorse

■ On the subject of remorse, the prosecutor commented:

[y]ou talk about two people laying there in a pool of blood and the defendant at that time is he thinking about remorse? Or is he thinking about how bad and how evil what he's done?

No. The first thing is he's irritated with Tyson because Tyson is sniveling and can't kill the girl like he's supposed to.

And the next thought is he's downstairs and he recalls like every good criminal, he recalls that the loot that he wants is in the kitchen in the woman's purse.

RT Vol. VII 1592:19–26. The prosecutor later commented:

the interesting thing is that you sat here during the course of this trial and when you saw certain exhibits passed around, it's just amazing how this person never holds a head down in shame.

Never once said to any of the doctors about the great remorse, the great feeling that this person has because he'd done something wrong.

Dr. Brannan says without conscience. Told Dr. Brannan, "If I'm out in 20 years, I'd do it all over again."

That's the remorse.

*Id.* 1609:14–23.

Petitioner contends that no evidence supported the prosecutor's statements, that remorse was not a proper factor for consideration, and that he had no opportunity for rebuttal. Petitioner is clearly wrong.

" 'The presence or absence of remorse is a factor relevant to the jury's penalty decision' in a capital case." *Harris v. Pulley*, 885 F.2d 1354, 1384 (9th Cir.1988), *cert. denied*, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990) (quoting *People v. Ghent*, 43 Cal.3d 739, 771, 239 Cal.Rptr. 82, 739 P.2d 1250 (1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 261 (1988)). Furthermore, the conclusion that Petitioner lacked remorse for his deeds is supported by implication, if not expressly, from the facts in evidence. Moreover, Petitioner's counsel had two separate arguments during the penalty phase within which to rebut the prosecutor's assertion that Petitioner lacked remorse. Thus, no error occurred by reason of the prosecutor's statements regarding remorse.

### b. The Victims' Loss of Life

Petitioner challenges the prosecutor's statements regarding the victims:

[t]here is no one here that's going to mention in talking about the man, talking about Miguel Vargas. What kind of a person he was. Whether he was a good person or not. The kind of life he wanted to have, that he expected to have, that he reasonably thought he should have.

The kind of opportunity and hope and faith that Salvador Vargas had who went up to rest that evening because he had to get up at 11:00 to go milk.

The kind of opportunity and hope that Lourdes Meza had that maybe she would be spared what happened to Miguel and Salvador if she just kept her mouth shut. And was passive to whatever took place.

It's those people are not here and they will never be here. They will never have all of these rights that this defendant has. Their rights are gone.

RT Vol. VII 1608:24–1609:10.

Read in context, it appears that the prosecutor's main theme was Petitioner, "the man." The prosecutor's short reference to the victims was simply an attempt to shed light on Petitioner's character, among other things, and assist the jury in determining the appropriate sentence. The nature and brevity of the prosecutor's comments did not constitute an improper appeal to the jurors' passions and prejudices.

Moreover, to the extent that the prosecutor's comments can be likened to victim impact statements, they were not constitutionally impermissible. *Payne v. Tennessee*, —— U.S. ——, ——, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991).

### 4. "Adding Up" and "Weighing"

During the course of his discussion regarding the applicability of each of the § 190.3 factors, the prosecutor stated, "[s]o as you consider these, how do you add these up? What is there mitigating about those?" RT Vol. VII at 1596:21–22. Petitioner interprets this statement as directing the jury to mechanically add up factors to see if the

**1490**

aggravating outweighed the mitigating. The court disagrees.

The prosecutor continually spoke of **weighing** the statutory factors. *Id.* at 1586:11–22; 1591:26–27; 1592:4–17; 1599:2–15; 1608:1. He did not mischaracterize the jury's ability to determine the appropriate weight for each factor. Moreover, the trial court instructed the jury to consider all of the evidence and to be guided by the applicable § 190.3 factors in determining Petitioner's sentence. *Id.* at 1613:3–7. Read in context, it cannot fairly be said that the prosecutor's statement directed the jury to utilize a numerical comparison of factors or led to the mechanical, arbitrary imposition of the death penalty.

### 5. The Jury's "Promise"

■ During his penalty phase opening, the prosecutor commented on the jury's "promise" regarding the appropriate penalty:

> [b]ecause you made a promise as you've sat here as jurors, you made a promise when you were asked whether or not you would impose and consider imposing the death penalty if it was appropriate.
>
> You each made that promise that you would give careful weight to the evidence and if you felt that the evidence required that death penalty, each of you said you would impose it. You said that without any reluctance.

RT Vol. VII 1592:3–10.

The foregoing statement was not error. A comment reminding the jury of its legal obligation is not constitutionally improper.

### 6. The Prosecutor's Alleged "Rape" Argument

The record does not support Petitioner's contention that the prosecutor argued, during the penalty phase, that Petitioner had raped Meza. Thus, no error occurred.

### 7. Diminishing the Jury's Responsibility

The essence of this aspect of Petitioner's argument is that the prosecutor improperly diminished the jury's sense of responsibility in deciding upon the appropriate penalty. For example, Petitioner maintains that the prosecutor "skew[ed] the jury in favor of death ... [failed to] appropriately channel[ ]

jury sentencing discretion," Pet. 104:19–21, and "remov[ed] from the jurors the sense of ultimate responsibility for determining whether death is the appropriate sentence for Petitioner." *Id.* at 104:25–105:2.

■ The court construes Petitioner's argument as a *Caldwell* claim. In *Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639–40, 86 L.Ed.2d 231 (1985), the Supreme Court determined that it was constitutionally impermissible to minimize the jury's sense of responsibility for determining the appropriateness of death. To state a *Caldwell* claim a petitioner must show that the prosecutor misled the jury regarding its role in sentencing. *See Darden,* 477 U.S. at 183 n. 15, 106 S.Ct. at 2472 n. 15 (1986).

■ The prosecutor did not mislead the jury regarding its sentencing role. It is expected in our adversarial process that counsel will attempt to sway the jury to his or her position. Thus, the prosecutor's so-called attempt to "skew" the jury's penalty determination was not error.

In any event, the prosecutor did not remove the jury's sense of responsibility with regard to Petitioner's punishment. The record shows that he closely tracked the § 190.3 factors during his argument. *See, e.g.,* RT Vol. VII 1587:2–1598:22. Moreover, he emphasized the jury's role in reaching its determination. *Id.* at 1586:11–22; 1591:26–27; 1592:4–17; 1599:2–15; 1608:1. In addition, he reminded the jury of its obligation to consider the facts and follow the law. *Id.* at 1585:27–28; 1586:7–9; 1592:14–16; 1598:28–1599:1; 1599:8–18; 1600:10–15; 1607:21–1608:7; 1608:12–23; 1610:28–1611:4. Consequently, the court finds that the prosecutor did not improperly "skew" the jury's determination or diminish its sentencing responsibility.

Accordingly, as the court finds no error with the prosecutor's comments, this claim is denied in its entirety.

### Q. Claim Q

Petitioner alleges that the trial court's reliance on "irrelevant and erroneous factors in ruling on [the] motion for modification of

sentence" violated his Fifth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, a reliable determination of death, and against double jeopardy.

■ California law requires the trial court to independently evaluate the evidence supporting the jury's sentencing findings and verdict. Specifically, Cal.Penal Code § 190.-4(e) provides:

> [i]n every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to subdivision (7) of Section 1181. **In ruling on the application the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. He shall state on the record the reason for his findings.**
>
> The judge shall set forth the reasons for his ruling on the application and direct that they be entered in the Clerk's minutes.

(Emphasis added).

■ The court has reviewed all of the factors and evidence considered by the trial court and concludes that, contrary to Petitioner's assertion, no constitutional violation occurred. Although the trial judge improperly considered Petitioner's CYA commitment and his statement that Meza was "required to submit to acts of sexual intercourse," CT Vol. II 453, this does not render the modification proceeding fundamentally unfair, raise doubts as to the reliability of Petitioner's sentence, or twice put him in jeopardy. The judge's consideration of the foregoing does not alter the fact that the evidence overwhelmingly supports the jury's findings and verdict and, therefore, the court's denial of the application for modification. Furthermore, notwithstanding the in-

valid factors, the trial judge cited sufficient additional factual support for his independent determination that the evidence supported the jury's findings and verdicts.

Petitioner's challenges to the additional grounds set forth by the trial court in support of its decision are also without merit. First, as discussed *supra* § III(D)(1)(b), admission of evidence regarding the camper incident did not violate due process. Moreover, because the incident involved the threat of violence, the trial court's consideration of this evidence as an aggravating factor was proper.

■ Second, Petitioner's contention that the court's consideration of his emotional state during the trial was improper is patently meritless. The jury is expected to observe and consider Petitioner's demeanor. *See, e.g., supra* § III(P)(3)(a). The judge, in considering an application for modification, is entitled to do no less. *See United States v. Schuler,* 813 F.2d 978, 981 n. 3 (9th Cir.1987).

Third, the judge's order denying the application for modification clearly reveals that his discussion closely tracked the § 190.3 factors. For example, the judge's statement that "[t]he victims did not consent and were not participants in the homicidal conduct," CT Vol. II 453, simply indicates that he was aware of this mitigating factor, but rejected it as inapplicable. There is no support for Petitioner's contention that the judge considered the absence of this, or any other, mitigating factor in aggravation.

■ Finally, Petitioner challenges the court's statement that "[t]he only explanation given by the Defendant [for his actions] was his 'intense dislike of Mexicans.' The acts were cruel and calculated." CT Vol. II 454. Regardless of whether Petitioner's hatred of Mexicans was his only motivation for committing the crime, it was a motivation and was therefore properly considered in aggravation as a "circumstance[ ] of the crime[s]." Cal.Penal Code § 190.3(a).

Accordingly, for the foregoing reasons, relief sought pursuant to Claim Q is denied.[53]

---

**53.** Petitioner's arguments that the trial court failed to consider relevant mitigating evidence, and that it considered matters not disclosed to the jury or counsel and which he had no opportunity to rebut are undeveloped and unsubstantiated and, therefore, not addressed by the court.

1492

### R. Claim R

Petitioner alleges that his Fifth, Eighth, and Fourteenth Amendment rights were violated because he was tried and sentenced pursuant to an unconstitutional death penalty scheme.

As previously discussed, *supra* § III(D)(2), the Supreme Court has upheld the constitutionality of California's death penalty scheme. *California v. Brown,* 479 U.S. 538, 540 n. *, 107 S.Ct. 837, 838 n. *, 93 L.Ed.2d 934 (1987); *Pulley v. Harris,* 465 U.S. 37, 53–54, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *California v. Ramos,* 463 U.S. 992, 1005 n. 19, 103 S.Ct. 3446, 3455 n. 19, 77 L.Ed.2d 1171 (1983). Accordingly, the relief requested pursuant to this claim is denied.

### S. Claim S

■ Petitioner alleges that the trial court violated his Eighth and Fourteenth Amendment rights to the constitutional imposition of the death penalty by failing to instruct the jury that it could recommend a sentence of life without the possibility of parole (LWOPP) "based on any mitigating circumstance or any aspect of Petitioner's background," Pet. 113:22–23, and by failing to countermand its guilt phase instruction that the jury was not to be influenced by pity or swayed by sympathy.[54] Petitioner asserts that these failures misled the jury into believing that it could recommend LWOPP "only if the mitigating circumstances it perceived related to the crime, rather than the crime and the offender." Pet. 114:9–11.

First, as discussed *supra* §§ III(M) and (O), the trial court's penalty phase instructions tracked Cal.Penal Code § 190.3, guiding the jury to consider all of the evidence and the applicable mitigating and aggravating factors. Such instructions were proper under California law. Furthermore, the court's omission of an LWOPP instruction did not preclude the jury from considering any relevant mitigating evidence. Consequently, it cannot be said that the instructions violated due process.

■ Second, the Supreme Court has determined that "sympathy" instructions similar to those given by the trial court do not violate the Eighth or Fourteenth Amendments. *California v. Brown,* 479 U.S. 538, 540–43, 107 S.Ct. 837, 838–40, 93 L.Ed.2d 934 (1987). Thus, the trial court's failure to countermand its "sympathy" instructions was not error.

Accordingly, relief as to this claim is denied.

### T. Cumulative Error

■ Petitioner argues that the errors set forth above, when viewed in the aggregate, demonstrate a breakdown in the adversarial process, undermine confidence in the outcome of the trial, and require that his convictions and death sentence be set aside. The court disagrees. It is true that Petitioner did not receive a perfect trial. However, the Constitution does not guarantee a perfect trial. *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). Instead, it mandates a fundamentally fair trial. Petitioner received a fundamentally fair trial.

ACCORDINGLY, IT IS ORDERED THAT the amended petition for a writ of habeas corpus is DENIED. The stay of execution is hereby VACATED. If Petitioner seeks, and the court grants, a certificate of probable cause, the court will then impose a stay of execution pending action by the Ninth Circuit. Local Rule 191(h)(6).

---

54. The court instructed the jury at the guilt phase that, in determining Petitioner's guilt, or lack thereof, it "must not be influenced by pity for a defendant or by passion or prejudice against him." RT Vol. VI 1402:12–13. The court further instructed the jury that it "must not be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Id.* at 1402:23–24.